**BRENNAN PETROLEUM PRODUCTS CO., INC., an Arizona corporation, Plaintiff,**

**v.**

**PASCO PETROLEUM CO., INC., an Arizona corporation et al., Defendants.**

**Civ. No. 74-48 Phx. WPC.**

United States District Court, D. Arizona.

Feb. 11, 1974.

Kenneth R. Reed of Martori, Meyer, Hendricks & Victor, Phoenix, Ariz., for plaintiff.

Donald D. Meyers of Meyers & Curtis, Phoenix, Ariz., for defendants.

## OPINION * AND ORDER

COPPLE, District Judge.

This is an action by a motor gasoline retailer against its supplier for violations of the Sherman, Clayton and Emergency Petroleum Allocation Acts. Jurisdiction is predicated on 15 U.S.C. §§ 1, 2, 15, 25; 28 U.S.C. §§ 1331, 1337 (1970); Emergency Petroleum Act of 1973, Pub.L.No. 93–159, § 5, 87 Stat. 627 ("Emergency Act"); Economic Stabilization Act of 1970, as amended, Pub.L. No. 92–210, §§ 210, 211, 85 Stat. 743 (1971) ("Economic Act").

Plaintiff moved for a preliminary injunction under count one of the first amended complaint. Cory's Gasoline Stations, Inc. moved to intervene as party plaintiff and for similar relief. Defendants moved to quash the temporary restraining order and order to show cause issued upon the filing of the origi-

---

* See Ninth Cir.R.Prac. 21.

nal complaint, and to quash accelerated depositions and a subpoena duces tecum. All the above matters came on for hearing on January 31, 1974. They were taken under advisement and the Court proceeded to hear evidence on the injunctive issue.

### Facts

The request for an injunction in this case is limited to allocation questions under the Emergency Act and Federal Energy Office (FEO) regulations. The material facts are undisputed. Pasco is a supplier to Brennan and Cory's of motor gasoline, and was during the 1972 base period established by the FEO regulations. All three are nonbranded independent marketers within the terms of the Act and regulations. The individual defendants are all officers and/or directors of Pasco.

Pasco's sole source of motor gasoline is Shell Oil Co.[1] Commencing in February 1973 Shell began limiting (allocating) its deliveries of gasoline to Pasco, who in turn rationed its supply to its customers. In January 1974 Shell allocated and delivered to Pasco some 94 percent[2] of the amount of gasoline it had delivered during January 1972. Up to the time the temporary restraining order issued, Pasco refused to deliver to Brennan in January 1974 more than 70 percent of the amount it had sold to Brennan in January 1972. A similar condition prevailed with regard to Cory's. On January 15, 1974, the FEO Mandatory Petroleum Products Allocation Program became effective. 39 Fed.Reg. No. 10, pt. III (January 15, 1974) (to be codified in 10 C.F.R. § 205.1 et seq.).

Pasco sells its gasoline to three defined classes: (1) independent retailers who market under their own trade names, (2) independent owners who market under Pasco's name, and (3) Pasco-owned and -operated stations flying the Pasco name. From 1972 to the time of suit, Pasco closed 27 retail stations and opened eight new ones. Defendant's Exhibit A.[3] In addition, it acquired three stations each from companies called Shepherd Bros. and U-Pump, which it now operates as wholly-owned. Pasco had supplied these two companies with at least part of their requirements in 1972. During the same period it took on as customers two newly opened stations independently owned and operated by persons named Eads and Walton.

From 1972 to the time of suit Brennan closed two of its four stations. It continued to supply a wholesale customer in Gilbert, Arizona. While Cory's had twelve stations during the same period, only two were in Maricopa County[4] and both were open at the time of suit. Both retailers had laid off employees and were operating their stations at reduced time and day schedules, depending on the availability of gasoline and on marketing decisions.

At the time of hearing, neither Cory's nor Brennan had applied to the FEO for a resolution of its problem. Additional facts will be recited as it becomes necessary to the discussion.

### Jurisdiction

Pasco challenges the subject-matter jurisdiction of the court, or in the alternative urges that plaintiff should be required to exhaust administrative remedies as a matter of absention policy. While the court has jurisdiction generally under the antitrust laws, the injunctive relief sought specifically relies on the regulations under the Emergency Act,[5] which adopted by reference the ju-

---

1. Mobil Oil Co. furnished one Pasco station up to September 1973, but is no longer a Pasco supplier. Defendant's Exhibit F.

2. All the figures herein are approximate, but definitive.

3. All exhibit references are to those on the hearing for preliminary injunction, January 31 1974.

4. Plaintiff has deemed Maricopa County the relevant market in this suit.

5. Emergency Act § 6(c)(5) recognizes that there will be actions under the antitrust laws, on contracts for sale or delivery, for failure or delay in providing fuel, and other suits, and provides the limited circumstances

dicial and administrative procedures of the Economic Act. Emergency Act § 5(a)(1).

It is defendants' position that sections 207–211 of the Economic Act evince a congressional intention that administrative bodies be given the first opportunity to resolve disputes in these sometimes complex economic areas. *See* City of New York v. New York Telephone Co., 468 F.2d 1401 (Temp.Em.Ct.App.1972); *cf.* McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). There is no doubt that where the attack is upon the regulatory program itself, as in *New York Telephone* where the matter was under submission to the price commission, it is appropriate for the court to stay its hand. *See also* Economic Act § 211(c), (d) (no injunction against enforcement generally shall issue except on final judgment).

█ Section 210 of the Act is a specific grant of jurisdiction over private disputes arising under it, without regard to the administrative procedures. McGuire Shaft & Tunnel Corp. v. Local No. 1791, UMW, 475 F.2d 1209 (Temp. Em.Ct.App.), cert. denied, 412 U.S. 958, 93 S.Ct. 3008, 37 L.Ed.2d 1009 (1973). It provides declaratory, injunctive and compensatory relief limited only by section 211(c), (d).

That finding is amply supported by the legislative history of both acts. The Senate had originally proposed that the Emergency Act include a specific right of action for private parties with disputes over petroleum allocation. The House proposed, and the conference adopted, the remedial provisions of the Economic Act. The relief provided by section 210 is identical in all material respects with the Senate proposal. The only reasonable inference is that the conference believed it had accomplished the Senate purpose. *See* Conf.Rep.No. 93–628, 93d Cong., 1st Sess., *in* [1973] 2 U.S.Code Cong. & Admin.News 2688, 2707–2708.

> This action [under section 210] is intended to be brought by private persons against other private persons. The government will not bring such action nor be the subject of one.

> Any person suffering legal wrong . . . may seek all appropriate relief . . . ."

S.Rep.No.92–507, 92d Cong., 1st Sess., *in* [1971] 2 U.S.Code Cong. & Admin. News 2283, 2291. *See also* H.R.Rep. No.93–531, *supra* note 4, at 2583 ("private actions are permitted"). The Economic Act therefore provides two methods by which the act and regulations may be enforced: through the administrative process by orders and other sanctions with appeal allowed to the courts (sections 207–208, 211), and a separate private remedy directly in the district courts for injunctive and treble-damage relief (section 210). The court has subject-matter jurisdiction of all counts of the complaint.[6]

█ Defendants further urge the Court to exercise its discretion to refuse jurisdiction or stay its hand pending application of the expertise of the FEO to the allocation problem. Where matters are committed to agency discretion, or the rules or subject-matter expertise are uniquely within an administrative body's competence, traditional doctrine dictates judicial abstention. McKart v. United States, *supra*, 395 U.S. at 193–200, 89 S.Ct. 1657; *see* Alabama Pub. Serv. Comm. v. Southern Ry., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951); Rail-

---

under which the act itself will be a defense to such a suit. *See* H.R.Rep.No.93–531, 93d Cong., 1st Sess., *in* [1973] 2 U.S.Code Cong. & Admin.News 2582, 2600.

6. *See also* Associated Gen. Cont. of Amer., Inc. v. Laborers Int. Union, 476 F.2d 1388, 1403–04 (Temp.Em.Ct.App.1973) (*N.Y. Telephone* rule not applicable where original jurisdictional base was under labor laws and collaterally but necessarily involved wage stabilization); *cf.* Municipal Intervenors Group v. FPC, 153 U.S.App.D.C. 373, 473 F.2d 84, 91 n.8 (1972) (*N.Y. Telephone* rule not reached where action arises under Economic Stabilization Act and jurisdiction is in district court, not court of appeals).

road Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

The FEO has power to issue remedial orders to cure violations of the act and regulations. FEO Reg. 205.2, 39 Fed. Reg. 1925 (Jan. 15, 1974) (to be codified at 10 C.F.R. § 205.2).[7] Brennan and Cory's could have petitioned for a determination that Pasco was in violation. 10 C.F.R. §§ 205.9, .82. There is no assurance in the regulations that a swift initial decision would be forthcoming, however. *See Id.* § 205.9(e); *cf. id.* §§ 205.81–.86. If, as defendants have suggested, an "interpretation" were requested, there are no time limits at all. *Id.* § 205.101.

On the other hand, FEO recognizes the dual relief afforded under the act by repeating that a private party may file an action under Economic Act § 210. 10 C.F.R. § 210.83.

As the discussion below will show, there are no special matters requiring agency discretion here. The relief sought is limited to a determination of the proper allocation fractions used by Pasco. The parties have stipulated that there are no priority questions under *Id.* § 211.103. Because Pasco is not a refiner or first supplier of product within the state there are no questions of state set-aside or regional adjustment. The limited question posed is whether Pasco properly assigned additional volumes over 1972 by defining certain users as "new customers" pursuant to *id.* § 211.13. Congress anticipated just such actions as this when it provided limited defenses in Emergency Act § 6. As Congress noted at the Economic Act's passage, such suits as this are "a traditional method by which violators of regulations may be discovered and other would-be violators may be deterred." S.Rep.No.92–507, *supra,* at 2291.

■ The regulations are fairly clear, as are the two acts, and the Court finds no reason to exercise its equitable discretion to abstain in favor of a prior agency determination.

### Injunctive Prerequisites

■■ Before the Court will issue a preliminary injunction, it must be demonstrated (1) that there is a real threat of irreparable harm to the applicant that is not remediable by damages, (2) that such harm weighs more heavily in the balance than likely injury to the enjoined party, (3) that plaintiff is likely to succeed on the merits, and (4) that there is no public policy adverse to granting the injunction. 11 C. Wright & A. Miller, Federal Practice & Procedure § 2948 (1973). The requirements for a permanent injunction may be generally less stringent, but require certainty on the merits. *See* United States v. City and County of San Francisco, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1940). The nature of the criteria above and the discretionary analysis involved are too well known to require explication here. *See generally* 11 C. Wright & A. Miller, *supra,* §§ 2942–2944.

■ If the injury amounts essentially to loss of sales and not to intrinsic damage to the business, an injunction is not appropriate. Virginia Airmotive, Ltd. v. Canair Corp., 393 F.2d 126 (4th Cir. 1968) (revocation of franchise affected less than 10 percent of historical sales). Where the complained-of action results not only in a contemporaneous loss of profits but in loss of goodwill or the ability to compete as effectively in the marketplace, the relief should be granted. Interphoto Corp. v. Minolta Corp., 417 F.2d 621 (2d Cir. 1969).

As noted earlier, Pasco and Cory's seek to force Pasco to redraw its allocation computation in such a manner that they will receive a direct pass-through of Shell's percentage allocation to Pasco. The likelihood of their success on the

---

7. All the current regulations appear in the same issue of the Federal Register: Vol. 39, No. 10, pt. III. Hereafter, citation will be to C.F.R.

merits of that issue is discussed in the section below. Defendants argue that all the opponents are losing is the dollar profit they would make on the sales of the additional gasoline sought. They suggest that the closing of stations while selling the same gallonage has in fact resulted in more economical operation and higher profit. The loss of permanent employees is by defendants' reasoning not a loss but a recovery of salary expense.

Plaintiff argues that the case must be viewed from the basis on which it was filed: the two retailers are losing competitive advantage that cannot be measured in dollars. The shortened deliveries of fuel result in both shortened and odd operating hours, which destroy the ability both to keep experienced personnel and to keep its image with the public as a sound, ongoing business. Indeed, Pasco refers to this latter factor, in its own application to Shell for an allocation adjustment, as "Further brand image deterioration." Plaintiff's Exhibit 3, at 4, ¶ 18.

That the industry may be generally in the same circumstance, or that the condition has existed for a year, is no answer to the allegation that the retailers are slowly strangling on restricted gasoline supplies. The harm is no less real because many are experiencing it. Furthermore, it was congressional cognizance of that condition that led to the legislation at issue. The policy of the Act is not merely to preserve "an economically sound and competitive petroleum industry," and "to preserve the competitive viability of . . . independent marketers," but to "restore competition" to the 1972 status quo. Emergency Act § 4(b)(1)(D). It was, then, precisely the type of competitive retraction alleged and shown here by the evidence that Congress sought to forestall.

The injury to defendants does not compare to the threatened harm of continued irreversible loss of competitive position demonstrated here, first, because Pasco is a substantially larger economic unit capable of spreading loss

more easily. Second, the gasoline it might not sell at retail if the relief is granted it will be selling at wholesale with some remaining profit. Finally, if defendants do not prevail on the merits, they cannot ask for continuation of an illegal practice because of potential injury to themselves.

■ If Brennan and Cory's can prevail on the merits, the prerequisites for injunctive relief are met.

### The Allocation Issue

The mandatory program reinstates the status quo ante of 1972 (May 1973 for prices) and strictly regulates changes from that norm. The central element in the allocation system is a person's base period volume—the amount in gallons of a particular product that he received during the comparable month in 1972. 10 C.F.R. § 211.51. This figure may be adjusted in certain circumstances, and is subject to reduction as the total allocable supply of that product decreases. See Emergency Act § 4; 10 C.F.R. §§ 211.12–.17. The adjusted base period volume of a supplier is the total of those of his customers. 10 C.F.R. §§ 211.11(b), .51. As plaintiff has suggested, once the computations are made the shares of the pie are set, though the pie itself may be larger or smaller from month to month. It is on this basis that Brennan and Cory's claim the same percentage of their 1972 purchases as Pasco receives from Shell of its 1972 purchases.

Upon the promulgation of the mandatory regulations, Pasco began its computation by adding up its January 1972 sales to wholesale purchasers (1.8 million gallons) and those to its own retail outlets (1.9 million gallons). It then treated the eight new stations it had opened, the six stations it purchased from Shepherd Bros. and U-Pump, and the Eads and Walton two stations as "new customers" pursuant to 10 C.F.R. § 211.13(c). It computed those 16 stations' allocations on the basis of their 1973 average monthly purchases and assigned a total base period volume of 1.6

million gallons. Defendants' Exhibit H. Of this last amount, 32,892 gallons were allocated to Eads, and 23,067 gallons to the Waltons, or a total of 55,959 gallons. The remainder of the new-customer volume, 1.58 million gallons, went to the 14 Pasco-owned stations. *See* Plaintiff's Exhibit 3, at 9.

Several things are immediately apparent from these figures. The result was to reduce by 30 percent each 1972 customer's share of the pie. Moreover, the primary beneficiary of the adjustment was Pasco itself, since the Eads and Walton shares were negligible.[8] Whereas Pasco claimed about one-half its allocable supply for its own stations in 1972, it now claims almost two-thirds.[9]

As a supplier, Pasco was free to make certain voluntary adjustments in the base period volumes of its purchasers, and consequently in the allocation fraction of all its customers.[10] The first method is for a purchaser to apply to his supplier for an adjustment based on "unusual growth" between the base period and the promulgation of the regulations.[11] 10 C.F.R. § 211.13(b), (e). A new customer may apply for the assignment of a base period volume. *Id.*

§ 211.13(c). If he is unable to find a supplier to take him on, the new customer may apply to the FEO for assignment.[12] In both cases, however, Pasco "shall not discriminate against independent wholesale purchasers" such as Brennan and Cory's in favor of either its own stations or independently owned stations flying the Pasco brand. *Id.* § 211.13(g).

To justify adjustment to the allocations mandated by 10 C.F.R. § 211.11, Pasco relies solely on its treating the 16 stations it commenced supplying or purchased after the start of 1972 as "new customers."

Section 211.13 of the regulations is in response to the congressional directive that the FEO "take into consideration market entry by . . . independent marketers . . . [and] expansion or reduction of marketing or distribution facilities of such marketers during or subsequent to calendar year 1972." Emergency Act § 4(c)(4)(A). Thus, "new customers" are new market entries, while "unusual growth" is the expansion by one marketer of his distribution facilities. A new customer is one "without an historical supplier." 10 C.

---

8. The amount is so small, in fact, that these two new customers alone could not trigger the 5-percent increase requirement in Pas-

co's base volume with Shell. 10 C.F.R. § 211.13(c)(1).

9. The relevant figures for January are:

| | | |
|---|---|---|
| Wholesale customers (1972 base): | 1,774,075 | gallons |
| Pasco stations (1972 base): | 1,874,807 | " |
| Pasco's Base Period Volume: | 3,648,882 | " |
| Eads & Walton stations (1973 base): | 55,955 | " |
| Pasco station additions (1973 base): | 1,576,585 | " |
| Pasco's Adjusted Base Period Volume: | 5,281,422 | gallons |

---

10. The terms of art used herein are defined in 10 C.F.R. § 211.51.

11. The purchaser must have a growth of at least 10 percent to qualify, and then is granted an adjustment only to the extent growth exceeds that figure. Adjustments involving growth rates over 20 percent must be approved by the FEO. Thus, the maximum voluntary adjustment is 10 percent.

10 C.F.R. § 211.13(b)(4), (5). Adjustments for growth since January 15, 1974 may be granted only by FEO. *Id.* § 211.13(e).

12. *Id.* § 211.13(m). The FEO may be appealed to in both cases, if the purchaser is dissatisfied. The FEO may make other adjustments as well. 10 C.F.R. §§ 211.13(j), (k), .14, .17. *See also* note 14 *infra.*

F.R. § 211.13(c). "Changes in ownership of a supplier or wholesale purchaser shall not alter supplier/purchaser relationships defined by specific dates or base periods . . . ." *Id.* § 211.-24(a). The previously promulgated regulations defined new customer to exclude the successor of a previously-existing purchaser. *Id.* § 200.25, 39 Fed.Reg. at 751, *revoked,* 39 Fed.Reg. 1924 (Jan. 15, 1974).

■ The conclusion from the cited authority is inescapable: The six stations Pasco acquired from Shepherd Bros. and U-Pump, which it had supplied during the base period, are not new customers but old. They are changed-ownership stations with an historical supplier—Pasco itself. They were not new market entries. Indeed, their acquisition by Pasco represented the demise of two independent marketers in contravention of the congressional design "to preserve the competitive viability of . . . independent marketers," which consideration is part of the decision to allow adjustments for new customers in the first place, under section 4(c)(4)(A)(i). Emergency Act § 4(b)(1)(D).

Treating these stations as new entries and assigning base period volumes as of 1973 was in patent violation of the regulations and the Act. The proper figures are the purchases by the prior owners during 1972. As Pasco supplied the stations during that period, the figures are within its control. If, as Pasco witnesses maintained at the hearing, those stations had other suppliers as well during the base period, Pasco should apply to them for an appropriate allocation. 10 C.F.R. § 211.11(b)(3).

It is equally clear that the eight stations constructed and opened by Pasco since the start of the base period are not new market entries but are "expansion . . . of marketing or distribution facilities" by a nonbranded independent marketer; *i.e.,* "unusual growth." Again, it is precisely this practice that Congress hoped to forestall. Pasco is a vertically integrated gasoline marketer which is to be prevented "from favoring his directly-owned outlets over . . . independent marketers. Allocations are required to be made in amounts equal to those which such marketers were able to obtain in calendar year 1972 where such allocations are practicable and consistent with the objective of [Emergency Act § 4(b)]." H.R.Rep.No.93–531, *supra,* at 2597–2598; *accord,* Conf.Rep.No.93–628, *supra,* at 2689.

Pasco effectively admits that these are "expansion" stations when it strenuously argues that it, like Brennan, is entitled to the entire base period volume of all its stations, even though it has since closed part of them. For that purpose, Pasco insists it is one marketer with one base period volume, regardless of how many outlets it currently is selling from. It cannot consistently argue that it is separate and apart from the newly constructed stations.

Pasco's remedy is to apply for an adjustment to Shell[13] based on unusual growth, changed circumstances, or some other ground. Indeed, two days after the complaint in this action was filed, Pasco did apply to Shell for such an adjustment. Plaintiff's Exhibit 3.

The effect of this practice with the fourteen "new" Pasco stations was even more in derogation of the congressional intent to return to 1972 status than appears *supra,* text & notes 8–9. In 1973, while Pasco was receiving from Shell 103 percent of its 1972 volumes on the average, it provided Brennan and Cory's with only 73 and 66 percent, respectively, of their 1972 volumes. *Compare* Plaintiff's Exhibit 3, at 3, ¶¶ 15&16, *with* Defendants' Exhibits D, E. Assuming other nonaffiliated customers were

---

13. Pasco is prevented from treating itself separately as supplier and wholesale purchaser such that it can apply to itself for an adjustment in this context. 10 C.F.R. § 211.13(g). Furthermore, it must support its application with facts of the type in *Id.* § 211.13(e).

treated similarly, the effect of using 1973 volume wherever possible was to perpetuate the very predatory tactics prevalent during the "voluntary" period that resulted in congressional action.

The only adjustments made by Pasco that have support in the regulations are the two stations owned by Eads and the Waltons, respectively. As noted above, however, their impact on the allocations was minimal at best.[14]

### Remedies

■ It is clear that Cory's is so situated that resolution of this action will practically affect its interest, and that the issues here are identical with those raised by its complaint in intervention. Intervention will not, nor has it so far, delay the action nor prejudice the existing rights of the parties. Fed.R.Civ.P. 24(a)(1), (b)(2).

■ The discussion above demonstrates that both Brennan and Cory's have amply met the criteria for issuance of a preliminary injunction that will:

1. Direct the defendants to distribute Pasco's allocable supply of motor gasoline each month to each of the plaintiffs "in an amount not less than the amount sold or otherwise supplied to such [purchaser] during the corresponding period of 1972, adjusted to provide —(A) . . . a pro rata reduction in the amount allocated to each" purchaser equal to the rate at which Pasco's supply is reduced, and (B) for taking into consideration bona fide new market entries Pasco is obligated to serve, or "unusual growth" adjustments made in the base period volume of any of Pasco's wholesale purchasers, treating all of Pasco's retail outlets as one such purchaser. Emergency Act § 4(c)(1), (c)(4)(A).

2. Direct Pasco to "allocate [its] total allocable supply among [its] wholesale

purchasers" each month. 10 C.F.R. § 211.11(b).

3. Enjoin defendants from treating any purchaser with an historical 1972 supplier as a new customer, and from computing allocation volumes for them other than on the base year 1972, notwithstanding an intervening change of ownership of such purchaser. Id. § 211.11(b)(3), .13(c), .24(a).

4. Enjoin Pasco from making any adjustment in the base period volume of its own retail operation, Id., § 211.13(g), and from treating its wholly-owned stations other than as one wholesale purchaser for petroleum allocation purposes. Emergency Act § 4(c)(4)(A)(ii).

5. Be conditioned on plaintiff Brennan continuing in force the bond heretofore posted on the temporary restraining order and Cory's posting a like bond.

Nothing in the injunction will prevent defendants from applying for an adjustment to Pasco's base period allocation in its capacity either as wholesale purchaser for retail sale or as supplier. The procedure is familiar to defendants—it is the one they recommended to plaintiff. See Plaintiff's Exhibit 3; Defendants' Motion to Quash; 10 C.F.R. §§ 205.1–.13, .21–.43, 211.13(b), .13(h), .13(i).

The Court will entertain a motion to quash or amend the preliminary injunction upon the issuance to defendants by the FEO of an order or other determination bearing on the subject matter herein.

It is ordered:

1. Defendants' motions to quash depositions and the subpoena duces tecum are denied as moot.

2. Defendants' motion to quash temporary restraining order and order to show cause is denied.

3. The application of Cory's Gasoline Stations, Inc. to intervene is granted,

14. Plaintiff suggests that even they are technically not new customers because it is admitted that neither of them applied "to their suppliers to be assigned a base period volume." If the Eads' and Waltons' stations, "under normal business practices, could logi-

cally have been served by [Pasco]," then Pasco "*shall accept*" them. 10 C.F.R. § 211.13(c) (emphasis added). The facts indicate at least an informal "application and acceptance."

and the Clerk shall file the first amended complaint in intervention heretofore lodged with the court.

4. Plaintiff and intervenor's motions for injunctive relief are granted.

5. Not later than three (3) days from the entry hereof, counsel for plaintiffs shall prepare a form of preliminary injunction, for approval by the Court, that conforms to the terms above and the criteria of Fed.R.Civ.P. 65(d).