Edwin J. BOEHM

v.

GULF OIL COMPANY OF PENNSYLVANIA, INC.

Civ. A. No. 77–3190.

United States District Court,
E. D. Pennsylvania.

June 30, 1980.

Matthew J. Ryan, III, Philadelphia, Pa., for plaintiff.

Hoyt H. Harmon, Jr., Bala Cynwyd, Pa., for defendant.

## OPINION

LOUIS H. POLLAK, District Judge.

The plaintiff, Edwin J. Boehm, is a citizen of Pennsylvania and, since 1971 or 1972, has been engaged in the retail gasoline business in the Philadelphia area. The defendant is Gulf Oil Corporation (hereinafter referred to as "Gulf"), a Pennsylvania corporation engaged in the business, among other things, of refining and marketing motor fuels.

Plaintiff's allegations against the defendant consist of two counts:

In his first count, plaintiff has alleged that Gulf violated the Emergency Petroleum Allocation Act of 1973 ("EPAA"), 15 U.S.C. §§ 751, *et seq.* (1976), and the regulations promulgated thereunder, 10 C.F.R. §§ 210–214 (1980), by its failure to honor certain discounts or sales allowances on the price of gasoline during the period from January 1, 1974 through October 27, 1976. Specifically, plaintiff alleges that Gulf violated the regulations in that: (a) it charged the plaintiff a price for motor fuel in excess of the base price permitted under 10 C.F.R. § 212.83; (b) it charged the plaintiff a price for motor fuel in excess of the price it charged others in the same class of purchaser as the plaintiff; (c) it charged the plaintiff a price for motor fuel without taking into consideration the customary price differential extended to the class of purchasers which plaintiff was a member.

In his second count, plaintiff has alleged that since June 1, 1973, defendant has failed to supply plaintiff with motor fuel at the price which defendant charged other purchasers in the same classification as plaintiff and that defendant's failure is contrary to the terms of an agreement between plaintiff and defendant entered into on or about April 12, 1973.

As the result of defendant's alleged violations, plaintiff complains that he has suffered damages consisting of increased costs of motor fuel purchased since June 1, 1973, and resultant loss of patronage and profits, and that he continues to suffer such damages.

The facts, which have been stipulated, may be summarized as follows: Early in 1973, Mr. Boehm found a property which he determined would be an excellent site for a large-volume "gas-and-go" type gasoline station.[1] He brought his proposal to the

---

1. A "gas-and-go" operation is different from the standard service station in that it relies on high volume sales of gasoline resulting from having lower retail prices than competition. Obtaining a price discount from the oil company supplier is a major factor in enabling the gas and go operator to sell at such lower prices.

attention of Gulf marketing officials and eventually met with Robert Frank, a Retail Marketer with Gulf's Philadelphia District Sales Office. Both men inspected the site and engaged in discussions concerning a possible gasoline supply contract. On February 3, 1973, in connection with the negotiations as to the price to be paid for defendant's gasoline, plaintiff furnished defendant with an affidavit to the effect that on February 1, 1973, Mobil Oil Co. had offered to sell plaintiff its brand of gasoline at prices equal to 3 cents below its (Mobil's) dealer tank wagon prices.[2] Among other things, this affidavit contains the following statements:

I am giving this affidavit to Gulf in order to induce Gulf to meet, in whole or in part, such competitive offer in the manner set forth below, knowing that Gulf intends to rely hereon:

\* \* \* \* \* \*

. . . it being expressly understood that Gulf shall have the right to withdraw or discontinue such payments (in whole or in part) at any time or from time to time during the term of such contract without notice.

On April 12, 1973, plaintiff and defendant entered into an agreement whereby effective April 1, 1973, defendant would supply plaintiff with plaintiff's requirement of No-Nox, Good Gulf and Gulftane gasolines. Prices and other terms were set forth in a "Contract of Sale" executed by the parties. The term of the Contract of Sale was five years from April 1, 1973, and the price basis specified was "Seller's scheduled price in effect at time and for place of delivery." Simultaneously with the execution of the Contract of Sale, plaintiff and defendant executed a letter agreement dated April 12, 1973, which provides as follows:

The Contract of Sale for a 5-year period effective April 1, 1973 between yourself [plaintiff] and Gulf Oil Company of Penn-sylvania, which was entered into today 4/12/73 has been negotiated on the basis of a Sales Allowance of 2.75 cents per gallon on Good Gulf and No-Nox only. Gulf reserves the right to withdraw this Allowance upon written notice being given to you.

Since the basis for this new Supply Contract is this Allowance, we hereby give you the option to cancel the Contract in the event we withdraw the Allowance given to you today upon thirty (30) days written notice to Gulf.

Gulf also agreed to install marketing equipment such as tanks, pumps, signs, lights, etc. at a cost of $32,210.00. A Provisional Payback Agreement generally required Mr. Boehm to purchase a minimum of six million gallons of Good Gulf and No-Nox gasolines between April 1, 1973 and March 31, 1978. In the event he did not purchase such minimum requirement, Mr. Boehm agreed to reimburse Gulf the installation expense of $32,210.00 reduced by the number of gallons actually purchased times .536 cents per gallon. The equipment would at all times be owned by Gulf.

Following execution of the contract, Mr. Boehm purchased the site. Thereafter, construction of the gasoline station began. On May 22, 1973, while construction was going forward, plaintiff received a letter from defendant advising that Gulf was cancelling the sales allowance of 2.75 cents effective June 1, 1973, pursuant to the April 12, 1973 agreement. This action resulted from changed market conditions occasioned, at least in part, by the crude oil embargo imposed by various Arab states in early 1973. The construction of plaintiff's gasoline station was not completed until December, 1973, enabling plaintiff to purchase 5,000 gallons prior to December 31, 1973. Thereafter, plaintiff purchased 1.9 million gallons in 1974 and 1.35 million gallons in 1975, all at Gulf's dealer tank wagon price without the sales allowance of 2.75 cents.

2. The price at which a gasoline refiner or wholesaler sells gasoline to a retail service station dealer is generally termed by such refiner or wholesaler to be its "dealer tank wagon price." Prior to the summer of 1973, such sellers would often offer discounts to independent dealers (those who owned their stations) to acquire their business. Gulf terms its discounts off its dealer tank wagon price "Sales Allowances."

Plaintiff made oral requests to Gulf for payment of the sales allowances withheld by Gulf but no written claim was made by plaintiff. In or about September, 1975, a formal complaint was filed by the plaintiff with the Federal Energy Administration ("FEA").[3] The FEA conducted an initial investigation and issued a Notice of Probable Violation ("NOPV") to Gulf on December 1, 1975. Gulf's response to this Notice was principally based on its assertion that the sales allowance issued to plaintiff was a "temporary allowance" as opposed to a "customary allowance," and, under applicable FEA rulings, could be withdrawn. The FEA Area Manager sustained Gulf's position and rescinded the NOPV on July 12, 1976.

## I.

Before turning to the merits, it will be appropriate to take note of certain affirmative defenses pressed by Gulf.

## A.

Gulf contends that this court lacks jurisdiction over the subject matter of plaintiff's complaint. Defendant's contention is without merit. Section 754 of the EPAA establishes mechanisms for the administration and enforcement of the Act as follows:

. . . [S]ections 205 through 207 and sections 209 through 211 of the Economic

Stabilization Act of 1970 (as in effect on November 27, 1973) shall apply to the regulation promulgated under section 753(a) of this title, [that section authorizing the President to promulgate the price regulation applicable to the present dispute], . . . and to any action taken by the President . . . under this chapter, as if such regulation had been promulgated, . . . or such action had been taken under the Economic Stabilization Act of 1970.

*Emergency Petroleum Allocation Act of 1973,* 15 U.S.C. § 754(a) (1976).

Section 210(a) of the *Economic Stabilization Act of 1970* ("ESA"), 12 U.S.C. § 1904 note (1976), provides that:

Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief, including an action for a declaratory judgment, writ of injunction (subject to the limitations in section 211), and/or damages.

Section 210 has consistently been recognized as an adequate basis for private suits for damages or other relief.[4] Taken together with Section 211(a), it appears to constitute ample statutory authority for district court jurisdiction over private-party dis-

3. Upon employment of the Federal Energy Administration Act of 1974, P.L. No. 93–275, 88 Stat. 96 (May 7, 1974), implemented by Executive Order 11790, the Federal Energy Office was abolished, and all authority delegated to the President by the EPAA was vested in the newly established Federal Energy Administration. Upon enactment of the Department of Energy Organization Act, P.L. 95–91, August 4, 1977, Executive Order No. 12009, 42 F.R. 46267 (September 15, 1977), the Department of Energy assumed the responsibility for enforcing the pricing and allocation authority. The FEA was the responsible agency at the time relevant to this case.

4. *Brennan Petroleum Products Co., Inc. v. Pasco Petroleum Co., Inc.,* 373 F.Supp. 1312, 1314–1315 (D.Ariz.1974); *Evanson v. Union Oil,* No. 4-75-Civ. 671 (D.Minn. Aug. 5, 1976), (1974–

1978 Transfer Binder) Energy Management (CCH) para. 26,056, pp. 26,446, 26,447; and *Templeton's Service, Inc. v. Mobil Oil Corp.,* 402 F.Supp. 368, 371 (E.D.Mich.1975). See *Dyke v. Gulf Oil Corp.,* 601 F.2d 557 (Em.App. 1979) where the Temporary Emergency Court of Appeals tacitly upheld district court jurisdiction over a private action under Section 210 of the ESA; and *Newman Oil Company v. Atlantic Richfield Company,* 597 F.2d 275, 279, *cert. denied,* 444 U.S. 842, 100 S.Ct. 83, 62 L.Ed.2d 55 (Em.App.1979), where the Temporary Emergency Court of Appeals recognized and extended the grant of jurisdiction over private party disputes under Section 210 to encompass a cause of action arising from a fraudulent representation intended to induce one party to forego his rights under the EPAA.

putes arising under regulations issued pursuant to the EPAA.[5]

## B.

■■ Gulf further contends that plaintiff has failed to exhaust his administrative remedies before the FEA. The contention is unavailing. Section 210 of the ESA is a clear grant of jurisdiction over private party disputes and is intended to be separate from and unfettered by any administrative procedures. Exhaustion of administrative remedies is not a necessary predicate to invocation of this court's jurisdiction under Section 210.

The doctrine of exhaustion of administrative remedies provides "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969) quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1938). But examination of the statutory scheme established to enable private parties to enforce EPAA regulations does not disclose any "prescribed administrative remedy" designed to take pre-cedence over the judicial remedy contained in Section 210. As the court noted in *Evanson v. Union Oil*, "[b]y incorporating section 210 . . . into the EPAA, Congress vested exclusive jurisdiction in the Federal courts over actions challenging . . . a private party's compliance with the regulations. . . . As a general matter, Congress contemplated that Federal courts are appropriate forums for interpreting FEA regulations and for adjudicating questions of compliance with the regulations." *Evanson v. Union Oil*, No. 4–75–Civ. 671 (D.Minn. August 5, 1976), (1974–1978 Transfer Binder) Energy Management (CCH), para. 26,056, pp. 26,446, 26,447–26,448, quoting *Inter City Oil Co., Inc. v. Murphy Oil Corp.*, No. 4–76–Civ. 65 (D.Minn. June 25, 1976) at Slip Op. 17. *See also, Templeton's Service, Inc. v. Mobil Oil Corporation*, 402 F.Supp. 368, 370–372 (E.D.Mich.1975) where the court also rejects application of the doctrine of exhaustion in a private party litigation alleging violations of FEA regulations.[6] Imposition of an exhaustion requirement in this case would operate to deny plaintiff the substantive rights created by Section 210. *Evanson v. Union Oil, supra*, at para. 26,056, pp. 26,446, 26,449.[7]

---

5. Section 211(a) of the ESA grants the district courts exclusive original jurisdiction of cases or controversies arising under the Act or under regulations or orders issued thereunder, notwithstanding the amount in controversy. Section 211 might be construed as a broad grant of jurisdiction to resolve private disputes such as the one at bar. Compare *Griffin v. United States*, 537 F.2d 1130 (Em.App.1976), *cert. denied*, 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 286, with *Lo-Vaca Gathering Co. v. Railroad Commission of Texas*, 565 F.2d 144 (Em.App.1977), *cert. denied*, 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 768 for a discussion by the Temporary Emergency Court of Appeals of the relationship between Sections 210 and 211. In *Griffin, supra*, at 1134–1136, the Court explains that Section 211 authorizes the overall jurisdiction of the courts involved while Section 210 establishes a specified right to utilize the jurisdiction afforded by Section 211. In *Lo-Vaca, supra*, at 146–147, the Court seemingly redescribes the relationship insofar as it construes Section 210 as creating a private cause of action against another party and construes Section 211 as providing a separate legal remedy for parties who have a complaint against the agency itself,

i. e., for parties who specifically request judicial review of an agency order or regulation.

6. "The legislative history of both the Emergency Act and the Economic Act is consistent with the foregoing analysis. The foremost Congressional concern in formulating the administrative procedure section of the Economic Act was a desire to provide a full and fair rulemaking process rather than to develop adjudicatory mechanisms for resolving disputes between private parties." *Templeton's Service, Inc. v. Mobil Oil Corporation, supra* at 371.

7. Were the rule otherwise—i. e., if exhaustion were required—it appears that plaintiff has in fact done all he could to pursue the meager administrative remedies available to him. Under regulatory procedures in effect in 1975, plaintiff's sole recourse was the complaint procedure defined under 10 C.F.R. Subpart N (§§ 205.180–205.185) (1978). Under this procedure, a complainant was required to submit a complete statement of facts pertaining to the act or transaction in question. Any action taken subsequent to the filing of the administrative complaint was left to the sole discretion of the FEA. The complainant was afforded no

Gulf also contends that plaintiff's failure to join the FEA as a party defendant is fatal to plaintiff's case. Gulf's contention is without merit. *Dyke v. Gulf Oil Corporation*, 601 F.2d 557 (Em.App.1979).[8]

## II.

The relevant Mandatory Petroleum Allocation Regulations at issue in this lawsuit are these:

The General Rule is 10 C.F.R. § 212.83 (1980), which provides

(a) General Rule. (1) Rule. A refiner may not charge to any class of purchaser a price for a covered product in excess of the maximum allowable price. . . .

Maximum allowable price is defined at 10 C.F.R. § 212.82(6) as follows:

"Maximum allowable price" means the weighted average price at which the covered product was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, computed in accordance with the provisions of § 212.83(a), plus increased product costs and increased non-product costs incurred between the month of measurement and the month of May, 1973.

The basic guidelines for class of purchaser determinations are set forth in 10 C.F.R. § 212.31, where the term "class of purchaser" is defined as:

. . . purchasers to whom a person has charged a comparable price for comparable property or service pursuant to customary price differentials between those purchasers and other purchasers.

The term "customary price differential" is defined in the same section as including:

. . . a price distinction based on a discount, allowance, add-on, premium, and an extra based on a difference in volume, grade, quality, or location or type of purchaser, or a term or condition of sale or delivery.

The dispute between the parties centers upon the meaning of those several provisions and how they relate to Gulf's price structure as it applied to plaintiff on May 15, 1973. The specific issue in the case asks whether the sales allowance of 2.75 cents per gallon which was in effect on May 15, 1973, under the terms of the supply agreement between the parties, is properly characterized as a "customary price differential" or as a "temporary competitive discount." Plaintiff contends that the proper characterization is the former. In plaintiff's scenario, a customary price differential would place plaintiff in a separate class of purchaser[9], thereby entitling plaintiff to

---

opportunity to participate in the complaint proceedings or to appeal from any agency action or inaction. The procedure was largely violator-oriented. The complainant played the rather minor role of "investigation-initiator." *Templeton's Service, Inc. v. Mobil Oil Corporation, supra* at 373. See also *Evanson v. Union Oil, supra* at para. 26,056, pp. 26,446, 26,448.

Subpart N was subsequently removed from 10 C.F.R. part 205, effective April 19, 1979 at 44 F.R. 23202, effective date corrected at 44 F.R. 24263. The effect of this removal is to deny a complainant of virtually all input into the administrative process.

8. In *Dyke*, the Temporary Emergency Court of Appeals held that the agency ordinarily may not be joined as a full-fledged party in section 210 litigation except under certain "compelling circumstances." *Id.* at 569. Explaining that its motive in past decisions compelling agency joinder in private litigation was not to "gratuitously constrain the agency but to seek its expertise and insight" as it applied to the particular dispute, the court instructed the district court "to consider, and when more appropriate

to avail itself of, the possible alternatives of intervention, 'amicus curiae' appearance, the principles of exhaustion of administrative remedies and primary jurisdiction, non-party discovery or other devices falling short of plenary joinder of the agency as a party." *Id.* at 569.

9. The FEA issued Ruling 1974 18 on June 12, 1974 (39 F.R. 21042, June 18, 1974). That Ruling stated that it was unlawful to charge different prices to individual purchasers which were members of the same class. The Ruling also made clear that:

A class of purchaser is . . . the smallest unit for which a uniform selling price may be computed because, by definition, no customary price differentials exist within a class of purchaser. It should be noted, however, that a class of purchaser may consist of only a single customer, if that particular customer alone was charged a comparable price for a comparable property or service pursuant to a customary price differential between the customer and all other customers.

continue to purchase his gasoline from Gulf at the discount price. In defendant's scenario, plaintiff is placed in a class of purchaser consisting of retail dealers purchasing at Gulf's dealer tank wagon price. As to this class, defendant argues, the allowance in question would be characterized as a temporary discount which could be withdrawn after the benchmark date of May 15, 1973.

A proper starting point for an appraisal of these opposed contentions is FEA Ruling 1975–2, issued on March 7, 1975.[10] The Ruling was intended to clarify the application of the class of purchaser concept and to provide guidance to sellers in making price distinctions between different purchasers. The Ruling reviewed some of the pertinent factors to be considered in making class of purchaser determinations. Those factors were listed as follows:

> (1) location,
> (2) type of purchaser,
> (3) volume, and
> (4) term or condition of sale or delivery.

These factors, in the order listed above, provide a logical sequence for making class of purchaser determinations.

*Id.* at para. 16,042, p. 16,584.

Plaintiff contends that he may be distinguished in a separate class of purchaser on the basis of factors (2), (3) and (4). The Ruling continues in elaboration of these factors as follows:

> In evaluating its sales from a particular location, a seller should next look to the types of customers it had, on May 15, 1973, for purposes of making price determinations. There are certain readily apparent distinctions to be made in this regard, such as those relating to recognized levels of distribution (e. g., wholesale, retail, end-user, branded, non-branded), and those relating to types of use (e. g., re-sale, industrial, commercial, residential, etc.) It should be noted in this regard that although certain industry-

wide practices have existed in regard to certain "customer-types," as to which customary price differentials existed, other practices as to price distinctions based on customer types may have varied from seller to seller, depending on circumstances.

> Having determined those types of customers which were treated differently from other types of customers for pricing purposes on May 15, 1973, a firm must next determine, as to each such type of customer, the extent to which prices of products were differentiated according to volumes purchased (e. g., sales in cargo lots, barge sales, pipeline sales, tankwagon sales, sales made pursuant to a sliding volumetric discount scale, etc.).

> Finally, a firm must determine, as to sales to each group of purchasers identified under the foregoing criteria (those purchasers which bought at a price reflecting the seller's location, the type of purchase involved, and the volume of product involved), the extent to which customary price differentials reflected differences in terms or conditions of sale or delivery on May 15, 1973. Such differences in terms or conditions may, of course, simply reflect purchaser delineations already made under other criteria, such as, for example, those respecting sales to branded and to nonbranded dealers. Differing terms or conditions of sale or delivery may, however, also serve to delineate still further classes of purchasers which are not distinguishable under the other criteria.

*Id.* at para. 16,042, p. 16,584. Plaintiff contends that application of these factors to this case reveals that plaintiff's high volume gas-and-go operation clearly differs from every other Philadelphia Gulf gasoline dealer and, therefore, entitles plaintiff to a separate class of purchaser determination. Specifically, under plaintiff's application of the "type of purchaser" criterion, plaintiff asserts that Gulf treated him differently

3 *C.C.H. Energy Management, Federal Energy Guidelines*, para. 16,027 (June 12, 1974).

**10.** 3 *C.C.H. Energy Management, Federal Energy Guidelines*, para. 16,042, p. 16,580 (March 7, 1975).

from its other Philadelphia dealers in that it assisted and advised plaintiff throughout the acquisition and construction of the facility. According to plaintiff's application of the "volume" criterion, plaintiff asserts that the volume of sales predicted and gasoline purchased by the plaintiff were exceptional or unique and represented a major difference in comparison to other Gulf purchasers. Plaintiff further asserts that the Provisional Payback Agreement was a "term or condition of sale" which would also distinguish the plaintiff from other retailers.

The Stipulation of Counsel is devoid of evidence supporting plaintiff's contention that Gulf's course of dealings with plaintiff, as contrasted with its dealings with other gasoline retailers, differed either in the nature of the negotiation process or in the conditions of the final agreement. The Stipulation also fails to demonstrate that these alleged differences were reflected in, or the basis of, the price differential. Plaintiff's contention that he was in a separate class of purchaser based on volumes purchased is not supported by evidence that plaintiff was uniquely a "high volume" retailer relative to other Gulf gasoline retailers, or that Gulf made its sales pursuant to a sliding volumetric discount scale.

■ The facts presented in the Stipulation indicate that plaintiff agreed to purchase gasoline from Gulf at its dealer tank wagon price to retail the gas to the public. Accordingly, it was proper for Gulf to place plaintiff in the class of purchaser consisting of retail dealers purchasing at Gulf's dealer tank wagon price.[11]

The determination that plaintiff was in a class of purchaser similarly situated with other retail purchasers does not entirely dispose of the issue. Under Ruling 1975–2, there are certain further considerations relevant to ultimate resolution of the issue whether the price allowance extended to plaintiff was a temporary price differential or a customary one (the latter classification,

if applicable, entitling plaintiff to be placed in a separate class of purchaser for the purposes of the applicable regulations): As the FEA explains, a firm may place its purchasers into appropriate categories as based on the four factors set forth in Ruling 1975–2 ("location," "type of purchaser," "volume," and "term or condition of sale or delivery"). But, there may nevertheless exist differences in prices charged to customers within those categories. In cases where purchasers are ostensibly similarly situated, remaining price distinctions between purchasers within the class must be examined and distinguished in accord with policies enunciated under the Robinson-Patman Act amendments to the Clayton Act, 15 U.S.C. § 13 (1976) as follows:

FEA's class of purchaser requirements are intended to be and should be construed as being consistent with requirements of the Robinson-Patman Act. Thus, in determining whether a price differential in effect on May 15, 1973, was a customary price differential which shall be maintained with respect to a class of purchaser, FEA will take into account whether the differential in question falls into one of the categories of differentials justified under the Robinson-Patman Act. If a price differential was justified under that Act because it reflected cost savings to the supplier and that differential is otherwise determined pursuant to FEA regulations to represent a "customary" price differential, FEA will generally require that a class of purchaser be established to reflect that differential, since presumably the justifications under the Robinson-Patman Act are as valid currently as they were on May 15, 1973. If, however, a price differential can be justified only as a competitive discount under § 2(b), (i. e., made in good faith to meet an actual lower bona fide offer or to offset a price war subsidy of a competitor), FEA will not require that a separate class of purchaser be established to reflect that differential.

---

11. As evidenced in the series of communications between Gulf and the FEA (Exhibits 0–1 and 0 2 in the "Stipulation of Counsel,") the

FEA apparently reached the same determination on this issue.

3 *C.C.H. Energy Management, Federal Energy Guidelines*, para. 16,042, pp. 16,580, 16,587 (March 7, 1975).

The affidavit presented by plaintiff to Gulf on February 3, 1973, supports Gulf's position that the sales allowance which it offered to plaintiff was a temporary discount offered solely to meet the offer of Gulf's competitor Mobil.[12] And there is no basis in the record for concluding that the price differential reflected a cost savings to Gulf. The discount appears, therefore, simply to have been, within the meaning of Ruling 1975–2, a "competitive discount" which did not call for the establishment of a separate class of purchaser and which, therefore, was terminable.[13]

## CONCLUSION

Gulf's termination of the sales allowance initially extended to plaintiff was proper under the terms of the agreement between the parties. Gulf, at all times, charged plaintiff a lawful price for the sale of gasoline under applicable FEA regulations.

Accordingly, in an order entered today, plaintiff's motion for judgment on stipulated facts is denied and defendant's cross-motion for judgment on stipulated facts is granted.

**12.** See also Exhibit B in the "Stipulation of Counsel," report of Gulf Retail Marketer Robert Frank, wherein Frank indicates to Gulf that the 2.75 cent sales allowance was offered ·to plaintiff to meet Mobil's competitive offer.

**13.** Plaintiff also contends that the sales allowance is justified as a customary price differential because it was the intent of the parties that the discount remain in effect throughout their entire course of dealing. Plaintiff relies on FEA Ruling 1974–18 which states that any discount in effect on May 15, 1973, that had either been in effect or had been granted for a period of six months or more, would presumptively be regarded as a customary discount. 3 *C.C.H. Energy Management, Federal Energy Guidelines*, para. 16,028 (June 12, 1974).

Plaintiff's contention is unavailing for two reasons. First, Ruling 1975–2 states generally that the FEA intends 1975–2 to be controlling over 1974–18. More specifically, Ruling 1975–2 states that:

> The position taken herein [that position being the one discussed *supra* which states that price differential determinations are to be

made in accord with Robinson-Patman Act considerations] obviates most of the need for the presumption in Ruling 1974–18 . . . .

Ruling 1975–2, *supra*, at para. 16,042, p. 16,588. Second, even if the presumption arising under Ruling 1974–18 had any continuing force, it is clear that it was not Gulf's intention that the sales allowance remain in effect for a period of six months or more. The letter agreement of April 12, 1973 states in unambiguous terms that Gulf reserves the right to withdraw the sales allowance upon written notice to plaintiff. The very inclusion of this clause in the agreement would tend to substantiate the conclusion *supra* that Gulf offered the sales allowance in response to what was then a competitive market situation. Gulf presumably foresaw the possibility that market conditions might change (i. e., become less competitive). The clause manifests an intent on Gulf's behalf to make the clause revocable at any time in the event that this possibility were in fact realized.