CARIBOU FOUR CORNERS,
INC., Plaintiff,

v.

AMERICAN OIL COMPANY, Atlantic Richfield Company, Chevron USA, Conoco, Inc., Exxon Corporation, Getty Oil, Gulf Oil Corporation, Kerr McGee Corp., Koch Refining Company, Little American Refining Co., Marathon Oil Company, Mobil Oil Corporation, Phillips Petroleum, Placid International Oil L.T.D., Shell Oil Co., Standard Oil Company of Ohio, Sun Company, Inc., Tennaco Oil Co., Texaco, Inc., Tosco Research, Inc., Total-Petroleum, Inc., Union Oil Co. of California, American Petrofina Inc., Amerada Hess Corporation, Asamera Oil (US) Inc., Ashland Oil Inc., Carbonit Houston, Inc., Champlin Refining Co., Crown Central Petroleum Inc., Diamond Shamrock Corp., Dorchester Gas, Dow Chemical Ref. U.S.A., Farmers Un. Central Exch. Inc., Hawaiian Independent Refinery, Hudson Oil Company, Inc., Hunt Oil Company, La Gloria Oil-Gas Co., Monsanto Co., Murphy Oil Corp., Pennzoil Company, Phillips Petroleum, Plateau, Inc., Quaker State Oil Ref. Corp., South Louisiana Production Co., Southern Union Ref. Co., Southland Corporation, Tesoro Petroleum Corporation, Union Carbide Caribe, Inc., Beacon Oil Company, Coastal Oil and Gas Corporation, aka Coastal States Gas, Coastal Oil and Gas Corporation, aka Coastal Petroleum Refiner, Golden Eagle Ref. Co., Inc., North American Petroleum Corp., Pester Refining Co., Western Refining Company (Now Industrial Energy Corp.) and John Doe Companies #1 through 50, Defendants.

Civ. No. C84–2173G.

United States District Court,
D. Utah,
Central Division.

Nov. 18, 1985.

Ronald C. Barker, Mitchell R. Barker, Salt Lake City, Utah, for plaintiff.

Mark L. Evans, Washington, D.C., for defendants.

J. THOMAS GREENE, District Judge.

This matter came on regularly for hearing on September 25, 1985, on defendants' Motions to Dismiss. Mark L. Evans appeared on behalf of defendant Amoco Oil Company and several other defendants and Ronald C. Barker and Mitchell R. Barker appeared on behalf of plaintiff Caribou Four Corners, Inc. Because the issues presented in the Motions to Dismiss would be dispositive as to all defendants, if granted, most of the defendants adopted and incorporated into their Motions to Dismiss the extensive legal memoranda submitted by defendants Amoco Oil Company and others and Amerada Hess Corporation and others. The issues were thoroughly briefed by plaintiff and defendants and all parties had opportunity to present extensive oral argument, after which the Court took the matter under advisement. The Court grants defendants' Motions to Dismiss and hereinafter sets forth its reasoning.

## FACTUAL BACKGROUND

This case arises out of a Department of Energy (DOE) Entitlements Program which affected several hundred oil companies and refineries throughout the country. In this novel lawsuit, Caribou Four Corners, Inc., one of the companies involved in the Entitlements Program, sued 105 private firms for entitlements Caribou claims were wrongly denied to it under the Program. Plaintiff characterizes this suit simply as a situation where the defendants have money belonging to the plaintiff and the plaintiff wants it back. In that regard, the plaintiff's suit is based on state common law theories of implied contract, unjust enrichment, quantum meruit, assumpsit and money had and received. The defendants, on the other hand, view this case as a premature challenge to Agency action involving the complex regulatory scheme promulgated pursuant to the Emergency Petroleum Allocation Act of 1973. Additionally, the defendants articulate several reasons why this Court lacks subject matter jurisdiction over this action. As will be discussed more fully hereafter, this Court disagrees with plaintiff's simplistic characterization and agrees with the defendants that this Court lacks jurisdiction to hear this case and that the plaintiff's action is a premature challenge to Agency action.

### The Entitlements Program

In 1973, Congress enacted the Emergency Petroleum Allocation Act (EPAA), Pub.L. No. 93–159, 87 Stat. 627 (codified at 15 U.S.C. § 751 et seq.) for the purpose of continuing price controls which had been implemented under the Economic Stabilization Act of 1970 (ESA), Pub.L. No. 92–210, 85 Stat. 743 (codified as amended at 12 U.S.C. § 1904 note). Section 4(a) of the EPAA specifically directed the President to issue regulations governing the price and allocation of crude oil and refined petroleum products. 15 U.S.C. § 753. Under the system, the President created two regulatory price tiers of crude oil. Volumes of crude oil produced and sold that were equal to or less than the volumes produced and sold in the corresponding month of the base period from the same property were called "old oil" and could not be sold at a price higher than the maximum allowable price. Volumes produced and sold that were in excess of the volumes produced and sold from the same property during the base period were called "new oil" and could be sold at market prices. All imported oil and "stripper well" crude oil were also exempt from price controls. In addition, the DOE provided incentives to producers by permitting old oil to be released from price controls based on increased production of new oil.

The artificial constraints on domestic crude oil, combined with significant increases in the price of foreign crude oil during the latter part of 1973 and most of 1974, caused a wide disparity between the average price of controlled domestic "old oil" and uncontrolled foreign and domestic oil. Although the "two tier" system effectively minimized the inflationary impact of rising world oil prices and provided incentives for increased domestic production, the end of the Arab oil embargo, the emergence of adequate crude oil supplies and the input cost of crude oil to refiners created a disparate impact on refiners without or with less access to price-controlled crude oil. Refiners who had greater access to volumes of price-controlled domestic oil had a significant advantage over their competitors who had relied upon oil acquired at world market prices. Contrary to some of the objectives of the EPAA, *see* § 4(b)(1)(A)–(I), [15 U.S.C. § 753 (b)(1)(A)–(I)], "economic distortions, interference with the competitive viability of the small and independent sectors of the petroleum industry, and inequitable prices to consumers developed in certain areas of the country under the two-tier system due to the varying reliance of the geographic region in which they made gasoline and petroleum product purchases on uncontrolled domestic and imported oil." *Cities Service Co. v. EFA*, 529 F.2d 1016, 1020–21 (TECA 1975), *cert. denied*, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976).

Pursuant to the EPAA, the Federal Energy Agency (FEA) adopted the Entitlements Program, 10 C.F.R. § 211.67, for the purpose of equitably allocating among domestic refiners the benefits associated with having access to price-controlled crude oil.[1] *See Cities Service Co. v. FEA*, 529 F.2d 1016 (TECA 1975) (giving a detailed description of the Entitlements Program), *cert. denied*, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976); *Pasco, Inc. v. FEA*, 525 F.2d 1391 (TECA 1975) (explaining the imbalance caused by the "two-tier" pricing system and the FEA's attempts equitably to allocate the benefits under the Entitlements Program).

The Program generally was to spread the benefits of access to "old oil" and the burden of dependence on "new oil" among all sections of the petroleum industry throughout the country and among all consumers of petroleum products, while keeping the anti-inflation measures and retaining the incentives to increase production provided by the two-tier system. Essentially, the Program required refiners to shift this overall reliance on controlled or uncontrolled oil to a balanced position among all the refiners. *Cities Service Co. v. FEA*, 529 F.2d at 1021. Specifically, the Entitlements Program attempted to allocate the benefits and burdens associated with price-controlled crude oil through a system of money payments among the oil companies participating in the program, rather than through the impracticable method of physically allocating the price-controlled crude oil. Refiners with lower than average access to the "old oil" received entitlements sales benefits. Those refiners with greater than average access to the "old oil" were obliged to purchase the entitlements.[2] By imposing this regulatory scheme, the FEA basically equalized the average weighted crude oil costs of all refiners, eliminating the inequities created

---

1. The FEA gave notice of its proposed Entitlements program pursuant to its rulemaking authority on August 28, 1974. *See* 39 Fed.Reg. 31650 (Aug. 30, 1974). Over 600 comments were received by the FEA in the public hearings that followed. The second notice of proposed rulemaking was issued in November of 1974. *See* 39 Fed.Reg. 39740 (Nov. 11, 1974). That notice was followed by 175 comments. The FEA issued the Entitlements Program in its final form on November 29, 1974. *See* 39 Fed.Reg. 42246 (Dec. 4, 1974).

2. The value of an entitlement was equal to the "exact differential between the weighted average cost of old oil and such weighted average cost of imported crude oil, stripper well crude oil ... heavy crude oil ... incremental tertiary crude oil ... tertiary incentive crude oil ... newly discovered crude oil ... market level new crude oil ... and other domestic crude oils the first sale of which is exempt from the provisions of Part 212 of this chapter, such costs to be equivalent to the delivered costs to the refinery." 10 C.F.R. § 211.67(i)(4).

by the price controls and placing the petroleum industry in the competitive situation that existed prior to the two-tier system.

Under this Program the DOE published a monthly schedule of purchase obligations and sales benefits. These monthly "Entitlements Notices" were based on information supplied the FEA by the refineries in their individual reports of crude oil runs-to-stills and purchases that occurred two months earlier. 10 C.F.R. § 211.66. For example, with respect to the October entitlements obligations, the data would be reported, the Entitlements Notice would be published, and transfer payments would be made in December. This two-month lag was due to the administrative complexities of computing the entitlements obligation of each refiner. *See Pasco, Inc. v. FEA*, 525 F.2d 1391, 1393 n. 4 (TECA 1975); *Diamond Shamrock Corp. v. Edwards*, 510 F.Supp 1376, 1380 n. 5 (D.Del.1981). The Program participants were on their own to arrange transactions among themselves, subject, of course, to audit and enforcement by the DOE, and if refineries failed to purchase or sell the entitlements specified in the notices, the agency could direct them to do so. 10 C.F.R. § 211.67(k). Also, the regulations prohibited entitlements transfers other than those prescribed in the monthly notices. 10 C.F.R. § 211.67(1).

The regulations required refiners to "correct any errors contained in" a monthly report "by filing an amended report for the particular month." *Id.* § 211.67(j)(1). The agency, in its discretion, could then "adjust entitlement issuances to the refiner ... in one or more months subsequent to the month in which the amended report [was] filed." *Id.* As will be discussed more fully hereafter, Caribou's claim arises from a clerical error that altered its net purchase obligations on the Entitlements Notice that was issued for December 1980. Before explaining that error, however, the Court must explain the Entitlements Exception Relief Program, which has particular significance to this case and to the Agency action.

Throughout the period of price controls, small refineries were the beneficiaries of various special subsidies implemented through the machinery of the Entitlements Program. *See, e.g.,* 49 Fed.Reg. 27410, 27411–12 (July 3, 1984). The costs of these subsidies were borne on a pro rata basis by all participants in the Entitlements Program. The costs of the subsidies naturally lowered a seller's sales benefit and raised a buyer's purchase obligation. One of the subsidy programs, the Entitlements Exception Relief Program, was available to those refineries which, because of the application of the price and allocation regulations, would be subjected to a "special hardship, inequity, or unfair distribution of burdens." 42 U.S.C. § 7194. Exception Relief frequently consisted of reducing a firm's obligation to buy entitlements, or authorizing action to sell additional entitlements, to the extent necessary to offset the hardship caused by the regulation and enable the company to attain its historical level of profitability. *See, e.g., Powerine Oil Co. v. FEA,* 536 F.2d 378 (TECA 1976).

In two decisions, the agency established what is known as the *Delta/Beacon* standards under which exception relief was awarded to certain refiners from their entitlements purchase obligation. *See Delta Refining Co.,* 2 FEA ¶ 83,275 (Sept. 11, 1975); *Beacon Oil Co.,* 3 FEA ¶ 83,209 (June 8, 1976). In general, the amount of subsidy or relief for which a firm was eligible was limited to the maximum value of the firm's entitlements purchase obligation. In granting this relief, the Agency ordinarily relied initially "on the applicant's own financial projections" and "its anticipated entitlement purchases for the months ahead." *Delta Refining Co. v. FEA,* 559 F.2d 1190, 1192 (TECA 1977). The Agency subsequently reviewed the relief granted in light of the applicant's actual financial and operating results to determine whether it had granted excessive or insufficient relief. *Id.* at 1193–95. If the amount of the exception subsidy awarded to a firm exceeded the *Delta/Beacon* limit, the firm could be required to refund the excess subsidy to the other participants in the Entitlements

Program through the purchase of entitlements. Conversely, if the amount of the exception subsidy awarded to a firm was less than the firm was entitled to under the *Delta/Beacon* standards, an additional exception subsidy would be awarded on subsequent Entitlement Notices. *See* 50 Fed. Reg. 1919, 1920 (Jan. 14, 1985) (giving a general explanation and discussion of the Entitlements Exception Relief Program). According to the DOE, Caribou received excessive entitlements exception relief in excess of $2.1 million.

*Decontrol*

In Executive Order No. 12287, President Reagan immediately "exempted" all "crude oil and refined petroleum products ... from the price and allocation controls adopted pursuant to the Emergency Petroleum Allocation Act." 46 Fed.Reg. 9909 (Jan. 30, 1981). Because of the two-month reporting lag as to the Entitlements Program, the Agency had not yet published the December 1980 and January 1981 notices. The President authorized the Secretary of Energy to "take such actions as he deems necessary to implement this Order, including the promulgation of entitlements notices for periods prior to this Order and the establishment of a mechanism for entitlements adjustments for periods prior to this Order." *Id.*

Shortly after decontrol, DOE issued the December 1980 list and instituted a rulemaking proceeding to devise a "clean-up" procedure for conducting the Entitlements Program. 46 Fed.Reg. 14157 (Feb. 26, 1981); 46 Fed.Reg. 15112 (March 3, 1981). The clean-up list was intended to provide a mechanism for making entitlements adjustments based on corrections of earlier reported data for pre-decontrol periods or changes resulting from judicial or administrative determinations made after the reporting date for the January 1981 list. Be-

fore the DOE could issue the January 1981 clean-up notices, however, a number of judicial challenges to the Agency's post-decontrol authority resulted in injunctions temporarily barring issuance of the notices.[3] Although the injunctions were ultimately lifted, DOE later decided not to issue the notices. 48 Fed.Reg. 50824 (Nov. 3, 1983); 49 Fed.Reg. 27410 (July 3, 1984). That decision was recently challenged and set aside in *Texaco, Inc. v. DOE*, 604 F.Supp. 1493 (D.Del.1985). The District Court there ruled that the DOE was obligated to publish and enforce the January 1981 clean-up notices under the Entitlements Program.

*The Present Action*

In its complaint, Caribou alleges that in January 1981, it filed with the Economic Regulatory Administration (ERA), the branch of the DOE responsible for administering the Entitlements Program, an amended report to correct errors in its October 1979 Entitlements Report. According to Caribou's complaint, an ERA clerk stamped the filing date on the cover page in a way that obscured the year. In preparing the December 1980 list, ERA misread the amended report and mistakenly treated it as a report for October 1980 rather than for October 1979. The December 1980 Entitlements Notice was issued on February 20, 1981. *See* 46 Fed.Reg. 14157 (Feb. 26, 1981). Because of that mistake, the complaint continues, the December 1980 Entitlements Notice reflected a net entitlements purchase obligation overstated by 78,862 entitlements at $27.06 each, or $2,134,005.72.

Caribou notified ERA of the error and an ERA representative acknowledged the error in a letter to Caribou stating that it would be remedied upon issuance of the January 1981 Entitlements Notice. Caribou apparently expected to obtain the full

---

3. Several lawsuits were filed immediately after the Decontrol Order was issued challenging DOE's authority to continue any aspect of the Entitlements Program on several different legal theories. *See* 48 Fed.Reg. at 50825 (Nov. 3, 1983). Because of the injunctions obtained in those lawsuits, DOE at first was prevented from issuing further lists after the list for December 1980 was published in February of 1981. After the Court injunctions were lifted, however, the DOE deferred publication of further lists pending the final determination on the merits of several other lawsuits. 46 Fed.Reg. at 60231 (Dec. 9, 1981).

amount of the error as an adjustment to the January 1981 Entitlements Notice. However, as discussed above, that notice was never issued and on July 3, 1984, after notice and opportunity for comment, the DOE published its final decision not to issue further Entitlements Notices, which since has been overturned by the Delaware District Court. It is too early to know whether the final notices in fact will be issued because that case currently is on appeal.[4] However, in oral argument, the parties indicated that the issuance of the January 1981 Notice would do little to benefit Caribou in light of the current posture of its claim with the Agency.

In July of 1982, Caribou filed with ERA an "Application and Claim for Refund" in the amount of $2,134,006 plus interest. If granted, that claim would be paid from a trust fund consisting of overcharge settlements collected from various oil companies in litigation arising from alleged violations of the price and allocation regulations.[5] In November of 1982, the ERA referred the refund application to the Office of Hearings and Appeals (OHA), the administrative tribunal within the DOE responsible for adjudicating entitlements exception applications. The OHA chose to treat Caribou's request as an Application for Exception, and OHA consolidated its consideration of the application with a review of Caribou's overall entitlements and obligations. *See Caribou Four Corners, Inc.,* 12 DOE Energy Mgmt. (CCH) ¶ 81,001 (April 9, 1984). OHA expressly acknowledged ERA's error and stated that it would take that error into account in its review of the exception relief previously granted to Caribou under the *Delta/Beacon* Standards. OHA first determined that Caribou's entitlement purchase obligation for the April-December 1980 period without accounting for ERA's error was $4,432,516. Then, taking into account the aforesaid error of $2,134,006, Caribou's net entitlement purchase obligation increased to $6,566,522. Next, the OHA determined the amount of exception relief Caribou had received during that period pursuant to the Entitlements Exception Relief Program, discussed *supra,* which amounted to $6,207,198. In the Proposed Decision and Order of the OHA it was determined that Caribou's net entitlement purchase obligation was the controlling test for Caribou's *Delta/Beacon* exception relief, which amounted to a deficiency in relief of $359,324 ($6,566,522—$6,207,198). In other words, the OHA simply subtracted the amount Caribou had received in exception relief from the amount of the entitlement purchase obligation for the same period, including the amount of the error. The OHA then found that Caribou had received excessive exception relief in the amount of $341,637 for its fiscal year ending on March 31, 1980. *See Caribou Four Corners, Inc.,* 9 DOE Energy Mgmt. (CCH) ¶ 82, 525 (Jan. 15, 1982). Combining the excessive exception relief for fiscal year 1980 with the deficiency in exception relief that Caribou had received for the period April-December 1980, the OHA concluded that Caribou should be granted additional relief of only $17,687 ($359,324—$341,637). *See Caribou Four Corners, Inc.,* 12 DOE Energy Mgmt. (CCH) ¶ 81,001, 81001-03 (April 9, 1984).[6]

4. In the aftermath of decontrol, DOE has continued to adjudicate individual entitlements exception orders for pre-decontrol periods. Relying on its decision to issue no further Entitlements Notices, DOE has determined that (1) already adjudicated awards of relief authorizing the sale of entitlements may be given effect from a special fund; (2) already adjudicated decisions requiring the purchase of entitlements will not be enforced; and (3) firms with pending and future claims for exception relief must show that they are suffering hardship in the current market. 50 Fed.Reg. 1919 (Jan. 14, 1985).

5. The office of Hearing and Appeals, OHA, administered a separate regulatory program known as Subpart V which has been established for the purpose of determining who was injured by the alleged violation and making appropriate refunds from a trust account consisting of payments made in enforcement settlements. *See* 10 C.F.R. § 205.280.

6. It should be recalled that under the *Delta/Beacon* standards, a firm may be awarded exception relief up to a maximum of its entire purchase obligation. Another way of looking at the OHA's analysis is as follows: Based on its year-end review of Caribou's financial data, OHA

On May 9, 1984, Caribou filed a Petition for Review of OHA's final decision with the Federal Energy Regulatory Commission (FERC)[7] under the procedures set forth in Section 504(b)(1) of the DOE Act, 42 U.S.C. § 7194 (b)(1). Initially, FERC held the administrative review proceeding in abeyance pending DOE's decision on the post-decontrol disposition of entitlements exception orders. In March 1985, FERC revived the case by issuing a brief schedule order, in which it framed the issue on appeal: "This case concerns DOE's practice of 'netting' which, in this proceeding, involves DOE's reduction of an admittedly incorrect entitlements purchase obligation incurred by Caribou by the amount of excessive exception relief previously granted to the firm."

### The Federal Tort Claims Action

It has been brought to the Court's attention that Caribou has also filed a claim for the $2.1 million under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq., in *Caribou Four Corners, Inc. v. DOE*, No. C83-0324 (D.Wyo. filed Aug. 9, 1983). The factual basis for that claim is identical to the factual basis alleged in this suit. In February of 1984, the defendants filed a Motion to Dismiss for lack of jurisdiction and Caribou filed a Motion for Summary Judgment. In August of 1984 the

Federal District Court for the District of Wyoming denied the Motion to Dismiss finding that Caribou had asserted a cognizable claim under the FTCA. The Court also denied Caribou's Motion for Summary Judgment without prejudice to reassert it "when appropriate." Accordingly, the Court stayed the proceedings "until such time as the office of Hearings and Appeals shall rule" on the claim filed with it by Caribou.[8] In February of 1985, after filing this action, Caribou moved to reassert its Motion for Summary Judgment. The Court extended the stay until August 1, 1985. That date having expired, the Court now has taken plaintiff's Motion for Summary Judgment under advisement.

Caribou filed this action contending that "[a]s a direct and proximate result of said error by ERA," it has been deprived of entitlement payments, and that defendants (other participants in the Entitlements Program) have been unjustly enriched. Caribou relies solely on a number of state common law theories such as unjust enrichment, implied contract, quasi contract, money had and received and assumpsit. Caribou does not allege any wrongdoing on the part of these defendants, nor does it rely on any federal statute or regulation that might direct the defendants to make

found that Caribou had obtained $341,637 of excessive exception relief for its fiscal year operations ending March 31, 1980 and had obtained $1,774,682 ($6,207,198 − $4,432,516 = $1,774,682) for that portion of Caribou's 1981 fiscal year ending December 30, 1980. Caribou then obtained a total of $2,116,319 ($1,774,682 + $341,637 = $2,116,319) in excessive exception relief for the relevant period. The OHA essentially "netted" that amount with the erroneous purchase obligations to find a net exception relief shortfall in the amount of $17,687.

7. FERC is a quasi-independent regulatory agency established as part of the DOE by Sections 204 and 401 of the DOE Act, 42 U.S.C. §§ 7134, 7171. It is authorized to review various actions of the Secretary of Energy, including OHA exception relief determinations under the procedures set forth in Section 504 of the DOE Act, 42 U.S.C. § 7194. The administrative procedures governing FERC's consideration of Caribou's petition for review are set forth at 18 C.F.R. § 385.1001 et seq.

8. At the time of decontrol, a number of Entitlements Exception Applications and Orders were pending including Caribou's refund claim and year-end review. After decontrol, OHA continued to grant entitlements exception relief conditioned on the exercise of agency discretion under the Decontrol Order to implement an adjustment mechanism. On July 9, 1981, DOE announced that it would not terminate consideration of the merits of exception claims *sub judice* before the agency decided whether or not to create an implementing mechanism. 46 Fed. Reg. 36092, 36096 (July 13, 1981).

In addition, the Federal Energy Regulatory Commission (FERC) and the courts continued to affirm or modify OHA awards of exception relief. Approximately 50 final orders were issued by OHA to require participants to purchase or sell entitlements that have not been implemented. 48 Fed.Reg. 50824, 50827 (Nov. 3, 1983). All exception awards were based on the assumption that some mechanism would be implemented to give effect to the awards.

entitlement payments. Instead, the plaintiff bases its common law theories on the federal program's operation and the DOE's error.

## I. SUBJECT MATTER JURISDICTION

In its Complaint, the plaintiff asserts 28 U.S.C. § 1331, 42 U.S.C. § 7192(b) and Rule 8(a)(1) of the Federal Rules of Civil Procedure as grounds for the invocation of this Court's jurisdiction over the common law claims. Alternatively, the plaintiff claims in its Memorandum in Response to the Defendants' Motion to Dismiss that jurisdiction is proper under Sections 210 and 211 of the Economic Stabilization Act, 12 U.S.C. § 1904 note. Plaintiff has also attempted to invoke this Court's jurisdiction under 28 U.S.C. § 1332.

### A. Federal Question Jurisdiction and the DOE Act

Title 28, Section 1331 grants federal courts original subject matter jurisdiction over civil actions which arise under "the Constitution, laws, or treaties of the United States." The plaintiff correctly states the general rule that under that section federal question jurisdiction is proper if the controversy requires construction of federal statutes or policies. Plaintiff goes on to assert that the federal question in this case arises "as a result of operation" of the Emergency Petroleum Allocation Act of 1973 (EPAA) (15 U.S.C. § 751, et seq.), and "from actions by that Federal agency." (Plaintiff's Response Memorandum to Defendants' Motion to Dismiss, at 4.) In other words, it is claimed that the plaintiff's common law theories against these defendants arise because of conduct of the DOE pursuant to its statutory rulemaking authority and administrative function rather than because of any conduct of the defendants other than their participation in the Entitlements Program. Plaintiff contends, however, that this action is not a challenge, direct or indirect, of Agency action. From the plaintiff's perspective, it simply is a

case in which the "defendants have money that belongs to Caribou." (Plaintiff's Response Memorandum, at 26.) This simple characterization of the case renders inconsistent plaintiff's assertion of this court's subject matter jurisdiction over the claims. If it simply is a case in which the defendants have money that belongs to Caribou, there is no federal question under Section 1331. If the case involves a federal question, i.e., the construction and/or interpretation of federal law, the Court must carefully examine that law to determine whether the plaintiff is proceeding in an area where the more general remedies, including those provided by Section 1331, have been pre-empted by a "precisely drawn, detailed statute." *Brown v. GSA*, 425 U.S. 820, 834, 96 S.Ct. 1961, 1968, 48 L.Ed.2d 402 (1976). As will be shown, Caribou cannot bypass the administrative review procedure prescribed by the DOE Act where here, as in *Brown*, Congress intended the statutory remedy to be exclusive and preemptive of the more general remedies. As the *Brown* Court stated, "[i]t would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading." *Brown*, 425 U.S. at 833, 96 S.Ct. at 1968.

1. EPAA is Incorporated into the DOE Act which Provides its own Jurisdictional Mandates, Including Review of Agency Action

The Federal law that plaintiff asserts as the basis for federal question jurisdiction is the Emergency Petroleum Allocation Act, 15 U.S.C. § 751 et seq. The EPAA invokes certain provisions of the DOE Act, 42 U.S.C. § 7191, et seq., including jurisdictional grants and requirements which, if applicable, pre-empt the more general federal question jurisdiction. Section 504 of the DOE Act, 42 U.S.C. § 7194, provides a comprehensive scheme for administrative and judicial review of Agency exception decisions.[9] Section 504 provides that any

**9.** Although Caribou asserts that its "claim has never been one for exception relief," Plaintiff's

Response Memorandum, at 2, it does not deny that DOE treated the claim as an exception

person aggrieved by a denial of an exception request may seek "review of such denial by [FERC] and may obtain judicial review in accordance with this subchapter when the denial becomes final." 42 U.S.C. § 7194(b)(1). The provision for judicial review of agency action under the DOE Act [Section 502(a)], is as follows:

> Judicial review of agency action taken under any law the functions of which are vested by law in, or transferred or delegated to the Secretary, the Commission or any officer, employee, or component of the Department shall, notwithstanding such vesting, transfer, or delegation, be made *in the manner specified in or for such law.*

42 U.S.C. § 7192(a) (emphasis added). ERA's authority to operate the Entitlements Program and OHA's authority to adjust exception relief are functions created by the EPAA, then transferred to the DOE. *See* 15 U.S.C. § 761; 42 U.S.C. § 7151(a). Therefore, judicial review of DOE action must be had as provided by the EPAA, 15 U.S.C. § 754,[10] in the federal district court, once the administrative machinery comes to a complete halt.[11]

Section 502(b) is the other jurisdictional grant under the DOE Act and gives federal courts jurisdiction to hear disputes between private parties in appropriate cases that arise exclusively under that Act. Because of the DOE's involvement, the plaintiff pleads section 502(b) of the DOE Act as an additional ground to invoke this Court's jurisdiction. Section 502(b) states:

> Notwithstanding the amount in controversy, the district courts of the United States shall have exclusive original jurisdiction *of all other cases* or controversies arising exclusively under this chapter, or

under rules, regulations, or orders issued exclusively thereunder....

42 U.S.C. § 7192(b) (emphasis added). This section applies only to those cases not covered by Section 502(a), quoted *supra,* as evidenced by the "all other cases" language. Therefore, if the case is a challenge to Agency action, the plaintiff must comply with the judicial review functions of the DOE Act and the EPAA, and cannot qualify under Section 502(b). If the case is not a challenge to Agency action, this Court has jurisdiction of the claims under Section 502(b), only if they arise "exclusively" under the DOE Act. *See* 42 U.S.C. § 7192(b).

2. Plaintiff in Substance Seeks Review of Agency Action which Invokes § 502(a) to the Exclusion of § 502(b) and Pre-empts General Federal Question Jurisdiction

■ Plaintiff denies that this action is a challenge to agency action and claims simply that it is a private action between private parties. Plaintiff claims that since the DOE is not named as a defendant in this lawsuit, the action is not nor could it be a challenge to Agency action. Caribou is aware that to name the DOE as a defendant would be an overt premature challenge to the Agency's order denying the relief it seeks and necessarily would throw it out of court. As stated previously, Caribou has appealed the OHA's decision, *which appeal is pending before FERC.* In order to avoid a direct challenge to Agency action, plaintiff has brought this common law action against other participants in the Entitlements Program based upon various state common law theories. However, the only justification for these defendants' involvement in the lawsuit is because of an Agency decision that Caribou is entitled to

---

request. *See Caribou Four Corners, Inc.,* 12 DOE Energy Mgmt. (CCH) ¶ 81,001 at 82,503 n. 1 (April 9, 1984). Nor does it provide any basis for disturbing DOE's characterization of the claim.

**10.** Title 15, Section 754 incorporates jurisdictional requirements of the Economic Stabilization Act, as discussed *infra* at subpart B.

**11.** The legislative history of the DOE Act confirms that Congress intended judicial review to come only after, not before, a final decision by FERC. H.R.Rep. No. 539, 95th Cong., 1st Sess. 85 (1977), U.S.Code Cong. & Admin.News 1977, 854, 956. The statute makes no provision for direct judicial review of an OHA decision denying exception relief. *See DOE v. Brimmer,* 673 F.2d 1287, 1289–90, 1292 (TECA 1982).

receive only $17,000 in entitlements rather than $2.1 million under the EPAA, which allegedly has resulted in "unjust enrichment" to the defendants. But neither Caribou nor the defendants have a property right to entitlements funds independent of the federal regulatory program and the DOE's implementing orders. To find that the defendants have received money belonging to Caribou would require the Court to rule, in effect, that the Agency should have required the defendants to transfer payments different than those which in fact were ordered. That would constitute, in substance, judicial review of agency action. Therefore, this Court finds that Section 502(a), judicial review of agency action, applies to deny this Court of jurisdiction under Section 502(b), the private action provision.

As to the plaintiff's assertion of general federal question jurisdiction, the statutory scheme to which the plaintiff points as the basis therefor itself has an applicable jurisdictional guideline that is inconsistent with federal question jurisdiction as discussed above. This conflict must be resolved. The Court would find it incongruous to assume that Congress intended to allow plaintiff the option of pursuing administrative relief with the attendant judicial review of the agency's final decision *and/or* pursuing a claim against these defendants, as beneficiaries of an alleged *Agency* mistake, under the general federal question jurisdictional grant. In light of the Court's finding that this action is, in substance and effect, a challenge to agency action, we hold that the general federal question statute on which the plaintiff relies is displaced by the "precisely drawn, detailed statute" which provides for judicial review of agency orders. *See Brown v. GSA*, 425 U.S. 820, 834, 96 S.Ct. 1961, 1968, 48 L.Ed.2d 402 (1976).

In analogous cases courts have found that suits such as this one constituted impermissible collateral attacks on Agency action because plaintiff's grievance was with the Agency and not with the defendants. The plaintiffs in those cases were not allowed, through the guise of artful pleading, to proceed against the agency through the innocent defendants. In *Whitney National Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965), the Complaint, in form, sought an injunction prohibiting the Comptroller of the Currency from issuing a certificate of authority for a new bank. The Court, however, looked beneath the surface of the complaint to "the thrust" of the plaintiffs' claim and "the heart" of its argument. *Id.* at 417, 418, 85 S.Ct. at 556. The Court determined that the plaintiffs' dispute "in actuality," *id.* at 418, 85 S.Ct. at 556, was with the Federal Reserve Board, which had approved a plan to organize the new bank. Because the Federal Reserve Board, not the Comptroller, had exclusive authority to pass on the underlying question, the Court held that the plaintiffs could pursue their objectives only through the statutory procedure for review of Board actions. *Id.* at 420, 423, 85 S.Ct. at 557, 559. In other words, the Board's determination could not be "collaterally attacked in the District Court by a suit against the Comptroller". *Id.* at 421–22, 85 S.Ct. at 558. It was immaterial that the Complaint neither named the Federal Reserve Board nor expressly sought review of its order. The Court found that where Congress "has enacted a specific statutory scheme for obtaining review, and ... has directed such a procedure as that found in the [statute], the doctrine of exhaustion of administrative remedies comes into play and requires that the statutory mode of review be adhered to notwithstanding the absence of an express statutory command of exclusiveness." *Id.* at 422, 85 S.Ct. at 558. The Tenth Circuit reached a similar result, affirming a decision of this Court, in *Harr v. Prudential Federal Savings & Loan Association*, 557 F.2d 751 (10th Cir.1977), *cert. denied*, 434 U.S. 1033, 98 S.Ct. 766, 54 L.Ed.2d 780 (1978). In *Harr*, the Federal Home Loan Bank Board, in accordance with its statutory authority, approved an application by a federally chartered savings and loan to convert from a mutual association to a

stock association. Depositors thereafter brought an action against the association seeking injunctive relief and damages. They argued that the conversion plan was a wrongful taking of their interest in the association, that the proxy materials were fraudulent and deceptive, and that the association had violated Rule 10b–5 of the Securities and Exchange Commission. *Id.* at 753. The Court of Appeals determined that "the sole thrust of plaintiffs' argument [was] directed to what in reality was the [Federal Home Loan Bank Board's] decision" approving a plan of conversion from the mutual to the stock association. *Id.* at 754. Even though the Complaint neither named the Bank Board nor sought review of the order approving the conversion plan, the Tenth Circuit held that the District Court lacked subject matter jurisdiction over this "collateral attack on the [Board's] decision." *Id.* The Court ruled that "the cause of action, no matter how otherwise described, must in the first instance be a challenge to the approval by the Bank Board of the plan of conversion." *Id.* at 753. The statutory provisions for review of the Bank Board's decision provided the exclusive remedy available to the plaintiffs. *Id.* at 754.

Caribou's asserted claims against the defendants in this action can be similarly characterized. The action is derivative of the entitlements payments made by the defendants in compliance with DOE's Entitlements Notice. The thrust of plaintiff's complaint is directed to what in reality was an Agency decision, now pending on review before FERC. Caribou's dissatisfaction with the DOE's decision lies at the heart of its claim against the defendants. If allowed to proceed, the action would be a collateral attack on the Agency's decision. Here, no less than in *Whitney Bank* and *Harr,* Congress has prescribed specific procedures for obtaining review of the agency's decision. Those review procedures are "designed to permit agency expertise to be brought to bear in" the issues raised by Caribou. *Whitney,* 379 U.S. at 420, 85 S.Ct. at 557. Accordingly, Caribou is not entitled to bring this action but must pursue its claim for relief under the statutory mode of review outlined above.

3. State Common Law Remedies do not Provide a Basis for Federal Question Jurisdiction

Caribou's position is not improved by pleading legal theories that purport to arise under state law. In the case of *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981), the United States Supreme Court barred a state-law based collateral attack on an administrative order. In *Kalo Brick,* the railroad asked the Interstate Commerce Commission to approve its abandonment of a branch line that served the plant of Kalo Brick & Tile Co. Although Kalo Brick objected to the abandonment proceeding, it did not participate in the ICC abandonment proceeding, having failed to perfect its filing under the ICC's procedural rules. Instead, before the ICC issued a decision, Kalo Brick sued the railroad under Iowa state law, which made available "several causes of action for damages" to a shipper "injured as the result of a common carrier's failure to provide adequate rail service." *Id.* at 313, 101 S.Ct. at 1128. While the state action was pending, the ICC approved the abandonment. The Iowa Supreme Court nevertheless determined that Kalo Brick was entitled to damages based on its state law claims. The Supreme Court reversed, holding that Kalo Brick's collateral attack under state law was precluded by the federal regulatory scheme. *Id.* at 331, 101 S.Ct. at 1137. Although Kalo Brick's state court action did not refer directly to the railroad's abandonment, the Supreme Court nonetheless viewed the action as an attempt to circumvent in a collateral proceeding the ICC's approval of abandonment. "It is difficult to escape the conclusion that the [state court action] represented little more than an attempt by a disappointed shipper to gain from the Iowa courts the relief it was denied by the Commission." *Id.* at 324, 101 S.Ct. at 1133. Finding that Kalo Brick's state-law causes

of action were "essentially attempts to litigate the issues underlying [the railroad's] abandonment," the Court concluded that the questions raised in the state action were "precisely the sorts of concerns that Congress intended the Commission to address." *Id.* at 326, 101 S.Ct. at 1134. The Court also noted that the Commission actually had addressed the matters raised by Kalo Brick in the state action and that the Commission's findings simply left no room for further litigation over those matters. *Id.* at 327, 101 S.Ct. at 1135.

The similarities between Kalo Brick and the instant action are striking. Caribou seeks to recover from private parties for conduct not merely authorized but mandated by the Entitlements Notices issued by the DOE. No less than in *Kalo Brick,* such relief in this case would conflict with the statutory objectives.[12] Additionally, Caribou's cause of action arises simply because of its dissatisfaction with the relief granted by the agency. But as in *Kalo Brick,* Caribou may not "attempt ... to gain from [this court] the relief it was denied by the agency." *Id.* at 321, 101 S.Ct. at 1132. Another parallel is that the EPAA pre-empts the state law theories on

which Caribou relies, just as the ICC pre-empts Iowa's common law causes of action on which *Kalo Brick* relies.[13] The friction between state-law remedies and the federal regulatory system is equally clear in both cases. Allowing Caribou to proceed on the state common law theories would upset the balance struck by the agency entrusted with administering the federal energy program; Caribou's action is therefore barred by its conflict with the federal scheme. *See Mobil Oil Corp. v. Tully,* 653 F.2d 497 (TECA 1981), *vacated and remanded on other grounds,* 455 U.S. 245, 102 S.Ct. 1047, 71 L.Ed.2d 120 (1982).

**B. Economic Stabilization Act—12 U.S.C. § 1904 note**

The EPAA was passed as a corollary to the Economic Stabilization Act, 12 U.S.C. § 1904 note, and incorporates by reference the jurisdictional provisions of that Act as follows:

[S]ections 209 through 211 of the Economic Stabilization Act of 1970 ... shall apply to the regulation promulgated under section 4(a), to any order under this Act, and to any action taken by the Presi-

---

**12.** That conclusion is fortified by Section 6 of the EPAA, 15 U.S.C. § 755, which bars Caribou's claim against the private defendants under state and common law theories for breach of contract. Section 6(b) states:

The regulation under Section 753 of this Title and any order issued thereunder *shall preempt* any provision of any program for the allocation of crude oil, ... established by any state or local government if such provision is in conflict with such regulation or any such order.

15 U.S.C. § 755(b) (emphasis added). It is clear from the statutory language that Congress' intent was to preclude state involvement inconsistent with orders issued by the federal agency, in this case the OHA. Section 6(c) solidifies the defendants' statutory defense. It states:

There shall be available as a defense to any action brought for breach of contract in any federal or state court arising out of delay or failure to provide, sell, or offer for sale or exchange crude oil, ... that such delay or failure was caused solely by compliance with the provisions of this subchapter as with the regulation *or any order* under this chapter.

15 U.S.C. § 755(c). The Court is persuaded that each of the elements giving rise to this defense

is present in this case. First, Caribou has based its claim on common law contract theories which can be loosely characterized as claims for breach of contract. The equitable theories under which the plaintiff proceeds fall within the meaning and intent of the statute and are covered by its proscription. Second, Caribou's claim arises out of an alleged failure by defendants "to provide, sell, or offer for sale or exchange, crude oil." The Entitlements Program was a regulatory mechanism designed to provide all refiners with approximately equal access to the benefits of price-controlled crude oil. As stated above, the Entitlements Program was in lieu of the impracticable physical allocation of the crude oil. Finally, as applied in this case, the statute expressly exempts private Entitlements Program participants from liability to Caribou because the injury, if any, arose, "solely by compliance with ... the ... order." It was OHA's order netting Caribou's claim against $2.1 million Exception Relief subsidies Caribou had previously received. By purchasing and selling the entitlements as mandated by OHA and the DOE, the defendants are protected by the statute.

**13.** *See supra* note 12 for discussion.

dent (or his delegate) under this Act, as if such regulation had been promulgated, such Order had been issued, or such action had been taken under the Economic Stabilization Act of 1970. 15 U.S.C. § 754.

The jurisdictional provisions of the Economic Stabilization Act grant the district courts of the United States exclusive original jurisdiction over cases and controversies arising under that Act, and as incorporated, under the EPAA, or under regulations or orders issued thereunder, notwithstanding the amount in controversy. 12 U.S.C. § 1904 note. Caribou asserts the Economic Stabilization Act as an independent ground for jurisdiction to justify a private cause of action. We reject that assertion.

### 1. Private Actions Provided Thereunder do not Apply to the Facts Here

Caribou attempts also to invoke this Court's jurisdiction under Section 210 of the Economic Stabilization Act. That Section is the only jurisdictional grant under which a court could entertain a suit against a private party arising under the EPAA.[14] The scope of Section 210 is very narrow in its creation of a private cause of action. It states:

> (a) Any person suffering a legal wrong because of any act or practice arising out of this title, or any order or regulation thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief, including an action for a declaratory judgment, writ of injunction ... and/or damages.

12 U.S.C. § 1904 note. The case law and legislative history make it clear that Section 210 is a complement to the exclusive judicial review provisions of Section 211 of the Economic Stabilization Act. Section 210 is not designed as a means for evading those judicial review provisions, and courts have so held. For example, the Court in *Air Products and Chemicals, Inc. v. United Gas Pipeline Co.*, 503 F.2d 1060 (TECA 1974), contrasted the two sections to reveal Congress' detailed and careful jurisdictional grant to cover all possible contingencies under the EPAA:

> [S]ection 210 provides a judicial remedy for plaintiffs who have a complaint against a private party, usually a seller, who the plaintiff contends has injured him through a violation of the Act or regulations.

*Id.* at 1063.[15]

### 2. Judicial Review of Agency Action Applies

In contrast, Section 211 creates a judicial remedy for a plaintiff who has "been ag-

**14.** *See Siegal Oil Co. v. Gulf Oil Corp.*, 556 F.Supp. 302, 305 (D.Colo.1982), *aff'd*, 701 F.2d 149 (TECA 1983) (Section 210 creates specific rights that were unknown to the common law of any state and would not exist in the absence of a federal statute).

The plaintiff argues that Section 502(b) of the DOE Act grants the Court jurisdiction to hear this case as a private action arising under the DOE Act, discussed above. Assuming this case were a private action, Section 210 of the ESA as incorporated into the EPAA would be the proper jurisdictional grant on which the plaintiff would rely rather than Section 502(b) because the latter section applies to the cases that arise "exclusively" under the DOE Act. By plaintiff's own admission, this case arises under the EPAA.

**15.** *See also McCulloch Gas Processing Corp. v. Canadian Hidrogas Resources, Ltd.*, 577 F.2d 712, 717 (TECA) (the provision gives private parties a remedy to redress "legal wrongs" resulting from "violations of the statute, and orders and regulations issued thereunder by other private parties"), *cert. denied*, 439 U.S. 831, 99 S.Ct. 109, 58 L.Ed.2d 126 (1978).

The plaintiff contends that a "legal wrong" under Section 210 need not have been committed by these defendants for jurisdiction to lie. Plaintiff's Response Memorandum, at 9. However, the legislative history and judicial pronouncements clearly state otherwise. Section 210 was intended to "provide a traditional method by which violators of regulations may be discovered and other would-be violators may be deterred." S.Rep. No. 507, 92d Cong., 1st Sess. 9, *reprinted in* 1971 U.S.Code Cong. & Ad.News 2283, 2391. *See also* H.R.Rep. No. 714, 92d Cong., 1st Sess. 8 (1971); *Bulzan v. Atlantic Richfield Co.*, 620 F.2d 278, 282 (TECA 1980) (the "private remedy under Section 210 focus[es] on the relationship between an aggrieved party" and is "designed to provide a redress for a victim who has suffered an injury because of a violation of [an agency] regulation"). Caribou makes no attempt to square its theory with these authorities and cites no cases in which a

grieved by formal decisions or orders that denied administrative relief that they believe they were entitled to under the Act and implementing regulations." *Id.* The question, then, is whether this is, in reality, an action against private parties who the plaintiff legitimately contends has injured it through a violation of the Act or regulations,[16] or, whether this is an action by a party who claims injury due to formal decision or orders that denied it the administrative relief it believed it was entitled to under the Act and implementing regulations. In this regard, the plaintiff essentially answers this question for the court by asserting that its "legal theories ... arose as a result of operation of the DOE's Emergency Petroleum Allocation Act ... and from actions by that Federal agency." (Plaintiff's Response Memorandum, at 4.) It does appear that alleged operation of the DOE Act and actions of that federal agency are the causes of Caribou's grievances. Accordingly, Section 211 of the Economic Stabilization Act applies to the facts of this case to the exclusion of Section 210.

The Court agrees with the plaintiff that in an appropriate private suit for damages Section 210 combined with Section 211 would create "ample statutory authority for district court jurisdiction over private-

party disputes arising under regulations issued pursuant to the EPAA." *Boehm v. Gulf Oil Co.,* 496 F.Supp. 1060, 1063–64 (E.D.Pa.1980). The Court disagrees with the plaintiff's characterization of this case as an appropriate private suit for damages under Section 210. Therefore, to the extent that Section 211 jurisdiction is contingent on a finding of jurisdiction under Section 210, that basis fails as well. The Court infers from plaintiff's argument that it claims an independent ground for jurisdiction under Section 211. Section 211 in no way bolsters plaintiff's position. As discussed above, the legislative history and judicial pronouncements clarify the working relationship of Sections 210 and 211. Section 211, entitled "Judicial Review," provides an exclusive jurisdictional grant which expressly conditions jurisdiction to "set aside in whole or part ... [an] order"[17] upon judicial review of the agency's decision under the substantial evidence test.[18]

The complementary nature of Sections 210, private actions for alleged violations of orders, and 211, actions against the agency for exceeding its authority or issuing unsubstantiated orders, becomes evident. The plaintiff argues, however, that this

---

court entertained a Section 210 action in circumstance analogous to those here. The section 210 cases on which Caribou relies were actions against violators and for enforcement of regulations. In the present action, Caribou neither alleges a violation nor attempts to enforce regulations. Caribou's only legitimate jurisdictional assertion under Section 210, based upon these facts, would be if the agency ordered the defendants to purchase entitlements from Caribou and they refused. The Court will not stay the action in anticipation of that unlikely contingency, especially in light of the existence of a fund from which Caribou would be paid if it prevails in its administrative action.

**16.** Section 210 of the Economic Stabilization Act affords the plaintiff a remedy only when there is a legal wrong, arising out of an act or practice, by the defendant, which caused injury to the plaintiff. Caribou's assertion that it has stated a claim under Section 210 is not even colorable. Caribou's alleged injury, if any, would arise from a FERC affirmance of OHA's order that recognized the effect of ERA's clerical error and reduced Caribou's claim to $17,-

000 by netting $2.1 million in excessive entitlements exception relief subsidies against it. The defendants are not legally accountable for that OHA order and Section 210 does not provide a cause of action against blameless parties, especially against parties who followed the mandates of the regulations.

**17.** Section 211(g) implies that the grant is exclusive:

> *Except as provided in this Section, no court, Federal or State, shall have jurisdiction* or power ... to stay, restrain, enjoin, or set aside, in whole or in part, any provision of this title authorizing the issuance of such regulations or orders *or any provision of any such regulation or orders,* as to restrain or enjoin the enforcement of any such provision. 12 U.S.C. § 1904 (note) (emphasis added).

**18.** Section 211(e) grants the district court jurisdiction to invalidate an order of an agency "upon a determination that the order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence." 12 U.S.C. § 1904 note.

action does not challenge agency action nor would it displace the order. This Court finds otherwise. Because it is a challenge to agency action, the plaintiff must present that challenge in a legitimate action against the DOE once FERC hands down a final ruling in plaintiff's pending administrative action pursuant to the DOE Act, 42 U.S.C. § 7191, et seq.

### C. Other Jurisdiction Bases

1. Rule 8(1)(a) does not provide this court with Jurisdiction over Caribou's Complaint

Plaintiff asserts Rule 8(a)(1) of the Federal Rules of Civil Procedure as an additional ground to invoke this Court's jurisdiction. Rule 8(a)(1) simply sets forth general pleading requirements for jurisdiction in federal cases. It requires a "short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it." It is not to be "construed to extend or limit the jurisdiction of the United States District Courts or the venue of actions therein." Fed.R.Civ.P. 82. Therefore, Rule 8(a)(1) cannot be relied upon by plaintiff in invoking this Court's jurisdiction.

2. Diversity of Citizenship

 Finally, the plaintiff relies upon 28 U.S.C. § 1332, diversity of citizenship, as a ground for jurisdiction. For purpose of that assertion only, the court assumes that the required diversity exists and the jurisdictional amount is met. The plaintiff still is not in court. The specific jurisdictional mandates discussed above are not displaced by the general diversity grant. Diversity jurisdiction is not available to parties in lawsuits that involve federal acts that provide their own specific requirements for jurisdiction.

## II. RIPENESS—EXHAUSTION

We have found that this is an action in substance challenging an Agency decision so that Caribou's exclusive recourse is the statutory exhaustion procedure prescribed by the DOE Act, Section 504(b)(1), discussed above, which mandates review by FERC. Manifestly, Caribou was aware of that procedure by its filing a Petition for Review to FERC. The Court also finds that the action is premature and in violation of the doctrines of ripeness and exhaustion of administrative remedies.

Caribou's premature resort to this Court violates the basic rationale of the ripeness doctrine which is "to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). The doctrine of ripeness demands final agency action, which, contrary to plaintiff's contention, does not exist here. *See FTC v. Standard Oil Company of California*, 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980; *Texas Energy Reserve Corp. v. DOE*, 710 F.2d 814 (TECA 1983). If the agency action were final, the plaintiff legitimately could have named the DOE in this lawsuit. As things stand, plaintiff is pursuing its grievance against the DOE by way of its pending appeal before FERC, and is also maintaining direct legal action against it in another federal district court.[19]

 Caribou has failed to exhaust its administrative remedies, and for that reason alone the present action is premature. The exhaustion doctrine is "the long settled rule of judicial administration that no one is

---

19. Plaintiff's direct action against the DOE under the Federal Tort Claims Act is pending before the Federal District Court for the District of Wyoming. That case embraces plaintiff's grievance with the DOE for the error in preparing the December 1980 list, and in netting the amount of the error with Caribou's excessive exception relief. That action is stayed, however, pending final determination of the appeal before FERC.

entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted". *Myers v. Bethlehem Shipbuilding Co.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). The purpose of the rule is to permit the "administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." *Parisi v. Davidson*, 405 U.S. 34, 37, 92 S.Ct. 815, 817, 31 L.Ed.2d 17 (1972) [citing *McKart v. United States*, 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969) ]. The doctrine does not require the mere initiation of the administrative procedures; it demands their exhaustion. *Aircraft & Diesel Equipment Corp. v. Hirsch*, 331 U.S. 752, 767, 67 S.Ct. 1493, 1500, 91 L.Ed. 1796 (1947). Where, as here, the plaintiff fails to exhaust available administrative procedures, the action must be dismissed. *MGPC, Inc. v. DOE*, 673 F.2d 1277 (TECA 1982); *Hawthorne Oil & Gas Corp. v. DOE*, 647 F.2d 1107 (TECA 1981); *City of New York v. New York Telephone Co.*, 468 F.2d 1401 (TECA 1972).

For all of the reasons aforesaid, this action is dismissed as to all defendants.

IT IS SO ORDERED.